**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ANDREW W. RAYMOND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.: _____ |
| vs. | ) | |
| | ) | |
| UNLIMITED TAXES & MORE | ) | Jury Trial Demanded |
| FRANCHISING COMPANY, LLC, | ) | |
| UNLIMITED TAXES & MORE, | ) | |
| INC., | ) | |
| UNLIMITED TAXES & MORE | ) | |
| LICENSING COMPANY, LLC., | ) | |
| UNLIMITED TAXES & MORE TAX | ) | |
| TRAINING RESOURCE CENTER, | ) | |
| LLC and SHONDA M. MICKEL, | ) | |
| | ) | |
| Defendants. | | |

## <u>VERIFIED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF</u>

COMES NOW, Plaintiff Andrew W. Raymond, by and through undersigned

counsel, and files this Verified Complaint for Damages and Equitable Relief against

Defendants Unlimited Taxes & More Franchising Company, LLC, Unlimited Taxes

& More, Inc., Unlimited Taxes & More Licensing Company, LLC., Unlimited Taxes

& More Tax Training Resource Center, LLC, and Shonda M. Mickel (collectively,

"Unlimited" or the "Defendants"), and shows the Court as follows:

## PARTIES, JURISDICTION AND VENUE

1.

This Court has jurisdiction over one or more causes of action under 28 U.S.C. § 1332. The matter in controversy is between citizens of different States.

2.

Plaintiff Andrew W. Raymond ("Franchisee" or "Raymond") is a citizen of the State of Texas.

3.

Defendant Unlimited Taxes & More Franchising Company, LLC, is a Georgia limited liability company, and has its principal place of business in the State of Georgia ("UT&M Franchising"). UT&M Franchising is an affiliate of the other Defendants.

4.

Defendant Unlimited Taxes & More, Inc. is a Georgia corporation, and has its principal place of business in the State of Georgia ("UT&M Corp"). UT&M Corp is an affiliate of the other Defendants.

5.

Defendant Unlimited Taxes & More Licensing Company, LLC. ("UT&M Licensing") is a Georgia limited liability company and has its principal place of business in the State of Georgia. UT&M Licensing is an affiliate of the other

Defendants.

6.

Unlimited Taxes & More Tax Training Resource Center, LLC ("UT&M Training") is a Georgia limited liability company and has its principal place of business in the State of Georgia. UT&M Training is an affiliate of the other Defendants.

7.

Defendant Shonda M. Mickel ("Mickel") is a natural person, a citizen of the State of Georgia, and has her principal residence in the State of Georgia.

8.

The matter in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

9.

One or more causes of action in this action arises under a federal statute, including 18 U.S.C. 1343, 18 U.S.C. § 1961-1968, and 18 U.S.C. § 1964, et seq.

10.

Each Defendant caused a tortious injury to Plaintiff in Georgia, through acts and omissions inside and outside Georgia. Jurisdiction is appropriate against each Defendant in this Court.

11.

Defendants UT&M Franchising entered into a Franchise Agreement and Software License Agreement with Raymond in the state of Georgia, contacted Raymond by telephone and email in advance of Raymond executing the aforementioned agreements for the sake of soliciting the same, and transacted business in the state of Georgia.

12.

Defendant UT&M Corp entered into an Affiliate Software License Agreement with Raymond in the state of Georgia, contacted Raymond by telephone and email in advance of the aforementioned agreement for the sake of soliciting the same, and transacted business in the state of Georgia.

13.

Defendant UT&M Licensing contacted Raymond by telephone and email to solicit Raymond's interest in licensing this federally registered trademark[1], and transacted business in the state of Georgia.

14.

Defendant UT&M Training contacted Raymond by telephone and email to solicit Raymond's interest in providing training services to UT&M Training, and transacted business in the state of Georgia

---

[1] According to the United States Patent and Trademark Office trademark database, the trademark, Unlimited Taxes & More Inc.®, is owned by UT&M Licensing.

15.

Venue is appropriate in this Court as Defendants conduct business and regularly solicit business in this venue.

16.

Defendant UT&M Franchising has its principal office address business at 241-C West General Screven Way, Hinesville, GA 31313, and may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Shonda Mickel, who is located at 804 Jay Street, Hinesville, Georgia 31313.

17.

Defendant UT&M Corp has its principal office address business at 241-C West General Screven Way, Hinesville, GA 31313, and may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Shonda M. Mickel, who is located at 804 Jay Street, Hinesville, Georgia 31313.

18.

Defendant UT&M Licensing has its principal office address business at 241-C West General Screven Way, Hinesville, GA 31313, and may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Shonda M. Mickel, who is located at 804 Jay Street, Hinesville, Georgia 31313.

19.

Defendant UT&M Franchising has its principal office address business at

241-C West General Screven Way, Hinesville, GA 31313, and may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Shonda M. Mickel, who is located at 804 Jay Street, Hinesville, Georgia 31313.

20.

Defendant Mickel may be served with process by delivering a copy of the Summons and Complaint to her at her principal place of residence located at 804 Jay Street, Hinesville, Georgia 31313, or any other place that she may be found.

## FACTUAL ALLEGATIONS

**A.    Failure to Deliver FTC Disclosure Document**

21.

Defendants are in the business of selling a proprietary system for the operation of businesses that offer tax preparation services under the registered trademark, "Unlimited Taxes & More Inc.®" and the unregistered trademark, "Unlimited Taxes and More." UT&M Licensing applied for its registered trademark, "Unlimited Taxes & More Inc.®," in 2013.

22.

Because of widespread deception in the sale of franchises and business opportunities, the U.S. Federal Trade Commission (the "FTC") regulates the sale of franchises under an FTC rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" (the "FTC Franchise

Rule"). *See* 16 CFR Parts 436 and 437.

23.

Under the FTC Franchise Rule, a commercial business arrangement is a "franchise" if it satisfies three definitional elements; specifically, the franchisor must: (1) promise to provide a trademark or other commercial symbol; (2) promise to exercise significant control or provide significant assistance in the operation of the business; and (3) require a minimum payment of at least $500 during the first six months of operations. *See* https://www.ftc.gov/legal-library/browse/rules/franchise-rule.

24.

Defendants meet the definition of a franchise under the Franchise Rule.

25.

The FTC Franchise Rule requires franchisors to provide all potential franchisees with a disclosure document containing 23 specific items of material information about the offered franchise, its officers, and other franchisees, to enable the potential franchisees to weigh the risks and benefits of such an investment. *See* 16 CFR Parts 436 and 437.

26.

None of the Defendants has ever delivered to Raymond the required disclosure document and have thereby violated the FTC Franchise Rule.

27.

Defendants intentionally failed to deliver the FTC disclosure statement because they knew Raymond's review of the FTC disclosure statement would include material information of a negative nature about UT&M Franchising and its affiliates that would dissuade Raymond from purchasing the Franchise (collectively, the "Material Misrepresentations and Omissions").

28.

Defendants refrained from delivering the FTC disclosure statement from Raymond with the intent to induce Plaintiff to act to his detriment by purchasing the Franchise.

**B.     Franchise and Ancillary Agreements**

29.

Raymond signed a Franchise Agreement with UT&M Franchising on October 25, 2021, for a five-plus year term ending on December 31, 2026. Under the Franchise Agreement, Raymond acquired the right to operate a tax preparation service in Ft. Worth, Texas using UT&M Franchising's trademarks, systems, and procedures (the "Franchise"). The Franchise Agreement is attached hereto and incorporated herein by reference as Exhibit A. The Franchise Agreement includes Schedule A, Schedule B, and Schedule C, which were also signed by Raymond. *See* Exhibit A *supra*.

30.

8

Contemporaneously with his execution of the Franchise Agreement, Raymond also signed a Software License Agreement with UT&M Franchising and an Affiliate Software License Agreement with UT&M Corp. The Software License Agreement and the Affiliate Software License Agreement are attached hereto and incorporated herein by reference as Exhibit B and Exhibit C, respectively. UT&M Franchising and UT&M Corp are hereinafter referred to collectively as "Unlimited."

31.

At the same time, Raymond also signed a Franchisee Acknowledgment Agreement attached hereto and incorporated herein by reference as Exhibit D, a Protocol Acknowledgement attached hereto and incorporated herein by reference as Exhibit E, a Franchise Leader Acknowledgement Agreement attached hereto and incorporated herein by reference as Exhibit F, a Fraud Policy attached hereto and incorporated herein by reference as Exhibit G, and a Tax Preparer Affiliate Acknowledgement Agreement attached hereto and incorporated herein by reference as Exhibit H.

## C.    Location

32.

The Franchise operated from a storefront located at 6730 Brentwood Stair Road, Fort Worth, Texas 76112 (the "Storefront"). Unlimited leased the Storefront

and subleased it to Raymond for a yearly nonrefundable renewal fee of $10,000. *See* Schedule A to the Franchise Agreement. *See* Exhibit A *supra.*

33.

According to the Agreements, Raymond had no obligation to pay the renewal fee during the first year of the Franchise's operation; however, Unlimited breached the Agreements by demanding that Raymond pay the $10,000 renewal fee in January 2022, after less than three months of operation, instead of October 25, 2022.

**D.     Royalty and Transaction Fees; Financial Reports; Payment Process**

34.

Section 2.2 of the Franchise Agreement requires that Raymond pay Unlimited a continuing royalty, payable weekly, equal to 30% of all net revenue derived from the sale of goods and services provided by the Franchise (the "Royalty Fees"). *See* Exhibit A *supra.* The Software License Agreement and Affiliate Software License Agreement also reference the payment of the Royalty Fees. *See* Exhibit B and Exhibit C *supra.*

35.

In addition to the Royalty Fees, Unlimited is entitled to the payment of transaction fees under the Agreements. The Agreements require that the Franchise charge each of its clients the following fees: $99.00 Service Bureau Fee, $99.00

Transmission Fee, $99.00 E-File Fee/Doc Prep Fee, $275.00 Direct E-File Fee, and Taxpayer Advance Fee of between $45.00 and $100.00 (collectively, the "Transaction Fees").

36.

Under the Agreements, all revenue produced by the Franchise is automatically deposited into a bank account that Unlimited controls and under which it has complete and unfettered discretion.  *See* Exhibits A, Exhibit B, and Exhibit C *supra.*

37.

Unlimited requires the Franchise to input data into a software program to which Unlimited has unfettered access.   The software program details the following:

 (i) Each client serviced by the Franchise.

 (ii) The transaction Fees paid by each of the Franchisee's clients.

 (iii) The date the Franchisee filed federal and state tax returns for each client.

 (iv) The expected tax refund due for each client after deducting the transaction fees, royalty payment, other tax preparation charges, and the amount payable to the Franchisee.

 (v) The date the Internal Revenue Service and/or any state tax authority

deposited each client's tax refund into the bank account controlled by Unlimited.

(vi)    The amount of the Royalty due and payable to Unlimited from each client's tax refund.

(vii)   The balance due to the Franchisee from each client for services rendered by the Franchisee, including services performed by the Franchisee's affiliates.

(viii)  The remaining balance due to the Client.

38.

Unlimited has complete control over when and if the Franchisee or its affiliates are paid for services rendered to the Franchisee's clients.

**E.    Tax Returns Processed and Payments Received or Due and Payable**

39.

From October 25, 2021, through March 14, 2022, the Franchisee prepared federal and state tax returns for 198 clients who have already received tax refunds. Unlimited has received $313,516.40 in revenue attributable to these 198 clients.

40.

In addition, as of March 15, 2022, the Franchisee had prepared federal and state tax returns for over 500 additional clients who had not yet received tax refunds. On information and belief, Unlimited was to receive approximately

$791,700.00 in additional revenue attributable to those over 500 clients.

F.     **Affiliate Network**

41.

In addition to the revenue generated by the Storefront, Raymond also developed an affiliate network consisting of independent contractors that he engaged as tax preparers. Among these independent contractors was his mother, Tanya Raymond, who prepared approximately 75 to 85 tax returns.

42.

Tanya Raymond's tax return preparation services alone generated tax preparation fees to Unlimited of approximately $50,000, and royalties to Unlimited of approximately $29,000, with the balance of approximately $67,000 to have been split between Raymond and his mother. However, to date, Unlimited has withheld 100% of the payment due to Raymond and his mother.

43.

The other members of the affiliate network included Kayla Brown, Monica Brown, Erica Nelson, Christian Cardoso, Kierra Dickerson, Jahnell Easly, Kimberly Edwards, Laquita Edwards, Karen Neal, Laquan Skinner, Jasmeika Simons, and Kijandria Veal.

44.

These other members of the affiliate network, as of March 15, 2022, had

prepared approximately 885 tax returns. These tax return preparation services alone generated tax preparation fees to Unlimited of approximately $52,000, and royalties to Unlimited of approximately $30,000, with the balance of approximately $72,000 to have been split between Raymond and these affiliates. On information and belief, Unlimited has circumvented Raymond by paying certain of these affiliates directly, thereby cutting Raymond out of the loop. To date, Unlimited has withheld 100% of the payment due to Raymond.

43.

In direct competition with Raymond, and without terminating the Franchisee, Unlimited has recruited three of Raymond's affiliates, namely Laquinta Edwards, Erica Nelson, and Kierra Dickerson, to work directly for Unlimited to the detriment of Raymond.

**G.     Failure to Deliver Transaction Reports, Forfeiture of Fees, Withholding Additional Fees, and Denying Access to Bank Account**

45.

On March 16, 2022, Raymond received a text message from Defendant Mickel stating that "You're very immature!!! Your fees are forfeited. Please don't contact me again – your attorney can correspond with my attorney." *See* Text Message attached hereto and incorporated herein by reference as <u>Exhibit I</u>.

46.

Shortly thereafter, Unlimited instructed the bank to *withhold* further payments to Raymond and deny Raymond access to the bank account.

47.

Unlimited also cut Raymond off from receiving any further Transaction Reports. As a result, Raymond cannot determine with exactitude the tax preparation fees to which the Franchisee is entitled and Unlimited has wrongfully withheld.

48.

Declaring a forfeiture, withholding further payments to Raymond, denying Raymond access to the bank account, and withholding Transaction Reports all constitute additional breaches of contract by Defendants.

49.

Additional tax preparation fees payable to the Franchisee became due on March 30, 2022, April 7, 2022, and April 14, 2022. As of today's date, Unlimited has wrongfully withheld from Raymond at least $156,000.00 in tax preparation fees from the Storefront's operation and at least $141,000.00 from Raymond's affiliate network.[2]

## H.    Deactivation of Tax Preparation Software

50.

---

[2] As described previously, the exact amount of actual damages is not ascertainable at this time because Defendants have denied Raymond access to the Transaction Reports that provide the data required to determine Raymond's actual damages.

In mid-March 2022, without any notice of termination, Unlimited arbitrarily deactivated the tax preparation software that Raymond licensed from Unlimited. As a result, Raymond is unable to provide tax preparation services to new clients. Defendants' deactivation of the tax preparation software constitutes another breach of contract.

## I.    Wrongful Termination of Sublease

51.

As noted previously, UT&M Franchising leases the Storefront and subleases it to Raymond for a yearly nonrefundable renewal fee of $10,000. The annual renewal fee was due and payable on December 31, 2022, under the plain meaning of the Agreement. Defendants, however, breached the Franchise Agreement by improperly demanding that Raymond pay annual renewal fee in January 2022, or face eviction. Because of Defendants' superior bargaining power, Raymond was forced to pay the annual renewal fee 12 months before it was actually due.

52.

Then, in March 2022, the landlord showed Raymond a letter from Defendants advising the landlord that Raymond was vacating the premises on April 30, 2022. Until then, Raymond had no idea that Defendants were attempting to force him off the premises.  Raymond was forced to vacate the premises on April 30, 2022. Defendants' actions in forcing Raymond's departure from the premises also

constitutes a breach of contract.

**J.      Raymond Has Not Received any Notice of Default**

53.

The Agreements are in full force and effect. Raymond has not received any notice of default under the Agreements.

**K.      Wire Fraud**

54.

Unlimited engaged in a systematic and ongoing scheme with the intent to defraud, deceive, mislead, and/or fraudulently induce prospective franchisees to purchase franchisees from Unlimited rather than from other purveyors of tax preparation franchises. Unlimited knowingly devised or knowingly participated in a scheme or artifice to defraud Raymond or to obtain the money or property of Raymond by means of fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1843.

55.

Unlimited's business practices described above are contrary to public policy or fail to measure up to the reflection of moral uprightness, fundamental honesty, fair play and right dealing in the general and business life of members of society in violation of 18 U.S.C. § 1843.

56.

Unlimited could foresee that the interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. § 1843.

57.

In particular, Unlimited knew or could foresee that the interstate wires would be used to transmit false and deceptive descriptions of the Unlimited franchise opportunity on Unlimited Taxes websites.

58.

Mickel acting singly and in concert, personally or through Unlimited (or their agents), used the interstate wires or caused the interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Raymond, within the meaning of 18 U.S.C. § 1843.

59.

It is not possible for Raymond to plead with particularity all instances of wire fraud that advanced, furthered, executed and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Unlimited.

60.

All of the wire communications described above crossed interstate and international borders by reason of the technology used to transmit the communications.

61.

Some or all of the communications described above have appeared and continue to appear on Unlimited's websites or email servers since the date of their original posting.

62.

Each and every use of the interstate wires described above was committed by Unlimited with the specific intent to defraud Raymond by means of false or fraudulent pretenses, representations or promises. Unlimited's acts of wire fraud in violation of 18 U.S.C. § 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

63.

Raymond justifiably relied on Unlimited's fraudulent representations and omissions made pursuant to the above-described scheme, resulting in a loss of revenue to Raymond, a complete loss of Raymond's investment in the Franchise, Raymond's insolvency and business failure, damage to Raymond's reputation and credibility as a businessperson, entrepreneur, and manager.

## CLAIMS FOR RELIEF

### COUNT I

### *FRAUD / RESCISSION*

64.

Plaintiff realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

65.

Defendants intentionally made misrepresentations of material fact and/or caused to be made omissions of material fact to Plaintiff, as set forth above (collectively referred to as the "Material Misrepresentations and Omissions"), by failing to provide Plaintiff with the FTC Disclosure Document with the intent induce Plaintiff to act to his detriment by entering into the Agreements without the benefit of having reviewed the FTC Disclosure Document.

66.

Defendants knowingly and intentionally made the Material Misrepresentations and Omissions or caused the Material Misrepresentations and Omissions to be made.

67.

Defendants made or caused these Material Misrepresentations and Omissions both affirmatively and through silence or omission.

68.

Defendants intended Plaintiff to rely on the Material Misrepresentations and Omissions.

69.

Plaintiff reasonably and justifiably relied on the Material Misrepresentations and Omissions.

70.

The Material Misrepresentations and Omissions made by Defendants constituted fraud and intentional misrepresentation.

71.

Plaintiff suffered damages as a result of relying on the Material Misrepresentations and Omissions, and on the fraud and intentional misrepresentation by Defendants.

72.

Plaintiff is entitled to all losses, reasonable costs, reasonable expenses and reasonable attorneys' fees from Defendants.

73.

Plaintiff's damages include, but are not limited to, approximately $750,000.00 in tax preparation fees, and attorney's fees and expenses in this matter, and Plaintiff is entitled to collect these damages from Defendants.

74.

Plaintiff is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been satisfied or waived.

75.

Defendants' actions resulted in the Agreements being voidable at the will of Plaintiff, and, thus, Plaintiff is entitled to rescind the Agreements.

76.

Defendants are liable to Plaintiff in this action for rescission of the Agreements, pursuant to O.C.G.A. § 13-4-60. All conditions precedent to Plaintiff's entitlement to rescind have been satisfied or waived.

## COUNT II

### *NEGLIGENT MISREPRESENTATION*

77.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

78.

The claim made in this Count Two is made in the alternative to Count One and without waiving Plaintiff's right to a claim for rescission of the Agreements as set forth in Count One herein.

22

79.

Defendants had a duty to Plaintiff to speak the truth and to cause the truth to be spoken, when representations were made to Plaintiff which were material to Plaintiff's decision to enter into the Agreements.

80.

Defendants breached that duty and negligently made misrepresentations and/or omissions of material facts to Plaintiff. Plaintiff was a foreseeable party, who reasonably relied on the misrepresentations made by Defendants to his detriment; and, as a result, was proximately injured.

81.

Defendants are liable to Plaintiff for actual and consequential damages in amounts to be proven at a trial or hearing on damages.

82.

Plaintiff's damages include, but are not limited to, $750,000.00, his reasonable costs, reasonable expenses and reasonable attorneys' fees from Defendants, and Plaintiff is entitled to collect these damages from Defendants.

83.

Plaintiff is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been satisfied or waived.

## COUNT III

### *CONSTRUCTIVE FRAUD*

84.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

85.

The claim made in this Count III is made in the alternative and without waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in Count One herein.

86.

In relevant part, O.C.G.A. § 23-2-51(b) provides that "[c]onstructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another."

87.

Defendants have committed certain acts of omission or commission, which were contrary to legal or equitable duty, trust or confidence justly reposed, contrary to good conscience and injured Raymond:

88.

Raymond sustained loss and damage as the proximate result of Defendants'

constructive fraud, including, without limitation, the following:

(i)     A complete loss of Raymond's investment in the Franchise;

(ii)    Raymond's insolvency and business failure;

(iii)   Loss of income to Raymond; and

(iv)    Damage to Raymond's reputation and credibility as a businessperson, entrepreneur and manager.

89.

Raymond is entitled to relief in the form of general damages in an amount to be determined at trial.

90.

Raymond is entitled to relief in the form of attorneys' fees and expenses of litigation because Defendants engaged in constructive fraud.

91.

Raymond is entitled to relief in the form of punitive damages, in an amount to be determined at trial, because Defendants engaged in constructive fraud.

## COUNT IV

### *TORTIOUS MISCONDUCT / NEGLIGENCE PER SE*

92.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and

count of this Complaint as if fully set forth herein.

93.

The claim made in this Count IV is made in the alternative and without waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in Count One herein.

94.

Defendants owed a duty to Plaintiff not to engage in wire fraud in violation of 18 U.S.C. 1343 in a scheme to obtain money from Plaintiff by means of false or fraudulent pretenses, representations, or promises.

95.

Defendants breached the duty not to engage in wire fraud.

96.

Defendants owed a duty to Plaintiff not to engage in theft of money from Plaintiff.

97.

Defendants breached the duty not to engage in theft.

98.

Defendants owed a duty to Plaintiff not to engage in fraud.

99.

Defendants breached the duty not to engage in fraud.

100.

Defendants breached the duty not to engage in the wrongful conduct set forth in this Complaint.

101.

The breaches by Defendants constitute negligence per se.

102.

The breaches by Defendants proximately caused Plaintiff to suffer damages, including special damages, as set forth in this Complaint.

103.

Plaintiff is entitled to recover damages from Defendants under O.C.G.A. §§ 51-1-1, 51-1-6 to 8, and all other authority.

104.

Plaintiff's damages include, but are not limited to, $750,000.00, his reasonable costs, reasonable expenses and reasonable attorneys' fees from Defendants, and Plaintiff is entitled to collect these damages from Defendants.

105.

Plaintiff is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been satisfied or waived.

**COUNT V**

## CIVIL CONSPIRACY

### 106.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

### 107.

The claim made in this Count V is made in the alternative and without waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in Count One herein.

### 108.

"A conspiracy upon which a civil action for damages may be founded is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. The gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage." Cook v. Robinson, 216 Ga. 328, 329, 116 SE2d 742 (1960).

### 109.

Reasonable people, including a jury, could conclude that Defendants engaged in a conspiracy, and that the sole purpose of the conspiracy was to defraud Raymond cheating Raymond out of money he was owed.

### 110.

The facts indicate that all Defendants acted in a conspiracy among themselves. They engaged in multiple predicate acts as part of the conspiracy.

111.

The acts associated with the aforementioned elements of the conspiracy were tortious in nature.

112.

Defendants inflicted great harm upon Plaintiff through their predicate acts.

113.

Plaintiff sustained loss and damage as the proximate result thereof, including, without limitation, the following:

(i)     A complete loss of Raymond's investment in the Franchise.

(ii)    Raymond's insolvency and business failure.

(iii)   Loss of income to Raymond.

(iv)    Damage to Raymond's reputation and credibility as a businessperson, entrepreneur, and manager.

114.

Plaintiff is entitled to relief in the form of general damages in an amount to be determined at trial.

115.

Plaintiff is entitled to relief in the form of attorneys' fees and expenses of

litigation as a result thereof.

116.

Plaintiff is entitled to relief in the form of punitive damages, in an amount to be determined at trial as a result thereof.

## COUNT VI

### *GEORGIA RICO*

117.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

118.

Defendants have intentionally violated the Georgia Racketeer Influenced and Corrupt Organizations) Act ("Georgia RICO") at O.C.G.A. § 16-14-1 et seq., by engaging in, conspiring to engage in, or endeavoring to engage in, a pattern of racketeering activity, by engaging in multiple instances of fraud, wire fraud, theft, and wrongdoing against Plaintiff as set forth herein, and upon information and belief engaging in similar instances of fraud, wire fraud, theft and wrongdoing with regard to other consumers, entitling Plaintiff to treble and punitive damages under O.C.G.A. § 16-14-6(c).

## COUNT VII

### *FEDERAL RICO*

119.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

120.

Defendants have intentionally violated the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO") at 18 U.S.C. § 1961-1968 by engaging in, conspiring to engage in, or endeavoring to engage in, a pattern of racketeering activity, by engaging in multiple instances of fraud, wire fraud, theft and wrongdoing against Plaintiff as set forth herein, and upon information and belief engaging in similar instances of fraud, wire fraud, theft and wrongdoing with regard to other potential damages, entitling Plaintiff to treble damages and the cost of the suit, including a reasonable attorney's fee, under 18 U.S.C. § 1964.

121.

Federal RICO explicitly provides a cause of action for any person injured in his business or property by reason of a violation of the federal RICO statute. 18 U.S.C.S. § 1964(c).

122.

The U.S. Supreme Court "has made it clear that federal RICO applies 'not

just [to] mobsters' but to 'any person' who violates its provisions. The statute, moreover, is intended 'to be read broadly,' in accordance with "Congress' self-consciously expansive language and overall approach,' as 'an aggressive initiative to supplement old remedies and develop new methods for fighting crime,' regardless of whether the defendant is associated with organized crime or a 'respected business.'" <u>Chevron Corp. v. Donziger</u>, 974 F. Supp. 2d 362, 526-27 (S.D.N.Y. 2014) *citing* <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 497-99 (1985.

123.

To prove a violation of 18 U.S.C. § 1962(c), a Raymond must establish: (i) the existence of an enterprise which affects interstate or foreign commerce; (ii) that the defendant associated with the enterprise; (iii) that the defendant participated in or conducted the enterprise's affairs; and (iv) that the participation in or conduct of the enterprise's affairs was through a pattern of racketeering activities. <u>United States v. Goldin Indus., Inc.</u>, 219 F.3d 1271, 1274 (11th Cir. 2000) (*citing* <u>United States v. Weinstein</u>, 762 F.2d 1522, 1536 (11th Cir. 1985)).

124.

18 U.S.C. § 1961(4) defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

125.

At all relevant times, the enterprises alleged in paragraphs 126 through 140 infra were engaged in, and their activities affected, interstate commerce.

**A. The Individual Enterprise**

126.

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle v. United States, 556 U.S. 938, 946, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009) (*quoting* United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)).

127.

Although it need not have an "'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity," Goldin Indus., 219 F.3d at 1275, an association-in-fact nevertheless "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946.

128.

"[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is,

the pattern of racketeering activity requisite to the RICO violation." <u>Goldin Indus.</u>,
219 F.3d at 1275 (*citing* <u>United States v. Elliott</u>, 571 F.2d 880, 898 (5th Cir. 1978)).

129.

Unlimited and Shonda M. Mickel constitute an "enterprise," within the
meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that they are "a group of
individuals associated in fact" (hereinafter referred to as the "Individual
Enterprise").

130.

Unlimited and Shonda M. Mickel share the common purpose of, among other
things, fraudulently and deceptively selling a franchise to Raymond that failed to
comply with the FTC Disclosure Rule.

131.

Unlimited and Shonda M. Mickel are related in that they cooperatively
market and sell Unlimited Taxes & More Franchises.

132.

The Individual Enterprise possesses sufficient longevity for its members to
carry out their purposes in that the Individual Enterprise has operated, at a
minimum, since 2013, continues to operate, and continues to fraudulently induce
potential franchises to purchase the Unlimited Taxes & More franchises.

133.

Unlimited and Shonda M. Mickel are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Individual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

134.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 54 through 63.

**B. Corporate Enterprise (Alternatively)**

135.

In the alternative to ¶¶ 127 through 134 *supra*, UT&M Franchising, UT&M Corp, UT&M Licensing, and UT&M Training, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as the "Corporate Enterprise").

136.

UT&M Franchising, UT&M Corp, UT&M Licensing, and UT&M Training share the common purpose of, among other things, fraudulently and deceptively selling a franchise to Raymond that failed to comply with the FTC Disclosure Rule.

137.

UT&M Franchising, UT&M Corp, UT&M Licensing, and UT&M Training are related in that they cooperatively market and sell fraudulently and deceptively sell Unlimited Taxes & More franchises that failed to comply with the FTC Disclosure Rule and share common ownership.

138.

The Corporate Enterprise possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since 2013, continues to operate, and continues to fraudulently induce potential franchises to fraudulently and deceptively selling a franchise to Raymond that fail to comply with the FTC Disclosure Rule.

139.

UT&M Franchising, UT&M Corp, UT&M Licensing, UT&M Training and Shonda M. Mickel are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

140.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 54 through 63.

## COUNT VIII

### *BREACH OF CONTRACTS*

#### 141.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

#### 142.

The claim made in this Count Eight is made in the alternative and without waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in Count One herein.

#### 143.

To the extent that the Court denies rescission and enforces the Agreements, Defendants have breached the Agreements.

#### 144.

Defendants have failed to provide services as promised.

#### 145.

Defendants have failed to pay Plaintiff the amounts due to the Franchise.

#### 146.

Defendants have failed to provide access to the bank accounts maintained for Franchisee and have deactivated the tax preparation software, as promised.

147.

Defendants have otherwise breached the Agreements.

148.

Defendants have breached the implied covenant of good faith and fair dealing.

149.

Plaintiff is entitled to recover monetary and other appropriate damages from Defendants for breach of the Agreements, including but is not limited to $750,000.00.

150.

Plaintiff is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been satisfied or waived.

**COUNT IX**

***CONVERSION***

151.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

152.

The claim made in this Count Nine is made in the alternative and without waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in

Count One herein.

### 153.

As more specifically described above, Defendants converted includes, but is not limited to tax preparation fees in the amount of approximately $750,000.00 to the detriment of Plaintiff, and equity requires Defendants to compensate Plaintiff for this theft by returning the tax preparation fees due to Plaintiff.

### 154.

Plaintiff is entitled to recover monetary and other appropriate damages from Defendants, resulting from the conversion by Defendants.

### 155.

Plaintiff is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been satisfied or waived.

## COUNT X

### *UNJUST ENRICHMENT*

### 156.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

### 157.

The claim made in this Count Ten is made in the alternative and without

waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in Count One herein.

158.

As more specifically described above, Defendants were unjustly enriched to the detriment of Plaintiff, and equity requires Defendants to compensate Plaintiff for this benefit.

159.

Plaintiff is entitled to recover monetary and other appropriate damages from Defendants, resulting from the unjust enrichment of Defendants.

160.

The amount by which Defendants have been unjustly enriched includes, but is not limited to, tax preparation fees in the amount of approximately $750,000.00, and Plaintiff is entitled to collect the tax preparation fees from Defendants.

161.

Plaintiff is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been satisfied or waived.

## COUNT XI

### *PIERCE CORPORATE VEIL / AID & ABET BREACH OF DUTY*

162.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

163.

The claim made in this Count XI is made in the alternative and without waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in Count One herein.

164.

Upon information and belief, are sham or "shell" entities, solely organized and operated as the mere alter-ego or instrumentality of Mickel for her own personal benefit and financial gain and used to perpetuate fraud on Raymond and others.

165.

Specifically, upon information and belief, Mickel used Unlimited as an artifice of her fraudulent scheme to induce Raymond to build a lucrative tax preparation business, which Mickel intended to steal away from Raymond once the business developed momentum and could operate independently of Raymond. Mickel knowingly and intentionally falsely represented the services provided by Unlimited, commingled personal and business funds in connection with Unlimited,

41

undercapitalized Unlimited, and misrepresented the sustainability and ability of Unlimited to provide services promised.

166.

Upon information and belief, at all times relevant to the events alleged herein, Mickel exercised absolute and total dominion and control over Unlimited's finances and operations and used such for her own personal benefit.

167.

Upon information and belief, Mickel has disregarded the basic corporate and limited liability company formalities in her operation of Unlimited. This disregard includes but is not limited to the commingling funds and assets, undercapitalization, and otherwise operating Unlimited in such a way that the company no longer has its own corporate personality that is separate and distinct from Shonda M. Mickel.

168.

Based on the above, Mickel used Unlimited to perpetuate a fraud upon Raymond and, therefore, are individually liable to Raymond for the conduct described herein.

169.

Through improper and wrongful conduct, and without privilege, and with knowledge that Unlimited owed Raymond duties, Mickel acted purposely and with malice and the intent to injure Raymond.

170.

The wrongful conduct of Mickel procured a breach of Unlimited's duties to Raymond, which proximately caused damage to Raymond.

171.

Mickel is jointly liable with the other Defendants for the injuries to Raymond, and Raymond is entitled to damages from Mickel.

**COUNT XII**

***CONSTRUCTIVE TRUST***

172.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

173.

The claim made in this Count XII is made in the alternative and without waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in Count One herein.

174.

"A constructive trust is an involuntary equitable trust created as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner." Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao E Exportacao Ltda, No. 08-cv-20738-KMM, 2015 U.S. Dist. LEXIS 184368 (S.D. Fla.

Mar. 2, 2015) (*citing* In re Real Estate Associates Ltd. Partnership Litig.*, 223 F. Supp. 2d 1109, 1139 (C.D. Cal. 2002)), *affirmed* Platypus Wear, Inc. v. Horizonte LTDA, 693 Fed. Appx. 843, 2017 U.S. App. LEXIS 12337 (11th Cir. Fla., July 11, 2017).

175.

A constructive trust "is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity." O.C.G.A. § 53-12-132.

176.

"Equity will not allow one with a legal interest in a piece of property a windfall recovery when the beneficial interest should flow to another." Weekes v. Gay, 243 Ga. 784, 787 (3) (256 SE2d 901) (1979). A "constructive trust is a remedy created by a court in equity to prevent unjust enrichment." St. Paul Mercury Ins. Co. v. Meeks, 270 Ga. 136, 138 (2) (508 SE2d 646) (1998).

177.

"The imposition of a constructive trust requires: (1) the existence of res (property or some interest in property); (2) the right of the complaining party to that res; and (3) some wrongful acquisition or detention of the res by another party who

is not entitled to it." *See* <u>Burlesci v. Petersen</u>, 68 Cal. App. 4th 1062, 1069 (1998).

178.

Unlimited structured its franchise relationship with Raymond to assure that Unlimited had complete and utter control over any and all funds deposited in the Franchisee's bank account. These funds comprised not only Unlimited's Royalty and Transaction Fees, but at least $750,000.00 in revenues belonging exclusively to Raymond.

179.

"A fiduciary duty extends between parties when there is confidence reposed on one side and the resulting superiority and influence on the other.

180.

The extent of Unlimited's control over the revenues of the Franchisee imposed duties of care, confidentiality, loyalty, obedience, and accounting upon Unlimited.

181.

Unlimited has breached its fiduciary duties to Raymond and defrauded Raymond by wrongfully withholding from Raymond the revenues to which Raymond is entitled as Unlimited's franchisee.

182.

As a consequence of the fraudulent, wrongful, unlawful, and inequitable conduct of Unlimited, as alleged above, Unlimited has obtained property interests

and profits therefrom which in justice and equity belong to Raymond. These interests and profits include, but are not limited to, at least $750,000.00 wrongfully withheld from Raymond, and all sums derived from the investment of such profits and any assets purchased therewith, together with an amount equal to the remaining present value of the said property.

### 183.

The property Unlimited has withheld from Raymond is, on information and belief, in imminent danger of dissipation.

### 184.

A constructive trust arises as a matter of law when the facts giving rise to the fraud occur.

### 185.

The facts giving rise to Unlimited's fraud demands the imposition of a constructive trust to protect Raymond's property by removing that property from Unlimited's control and ordering Unlimited to immediately deposit not less than $750,000 in the registry of this Court.

**COUNT XIII**

***EQUITABLE LIEN***

### 165.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and

count of this Complaint as if fully set forth herein.

186.

The claim made in this Count XIII is made in the alternative and without waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in Count One herein.

187.

O.C.G.A. § 23-2-90(a) defines "equitable assets" as those assets which "may be reached only through the intervention of equity.". 843, 2017 U.S. App. LEXIS 12337 (11th Cir. Fla., July 11, 2017).

188.

The imposition of an equitable lien requires the right of the complaining party to those assets; and the wrongful acquisition or detention of those assets by another party who is not entitled them.

189.

Unlimited structured its franchise relationship with Raymond to assure that Unlimited had complete and utter control over those funds deposited in the Franchisee's bank account, which included, not only Unlimited's Royalty and Transaction Fees, but also not less than $750,000.00 in revenues belonging

exclusively to Raymond.

190.

As a consequence of the fraudulent, wrongful, unlawful, and inequitable conduct of Unlimited, as alleged above, Unlimited has obtained property interests and profits therefrom which in justice and equity belong to Raymond. These interests and profits include, but are not limited to, at least $750,000.00 wrongfully withheld from Raymond, and all sums derived from the investment of such profits and any assets purchased therewith, together with an amount equal to the remaining present value of the said property.

191.

The property Unlimited has withheld from Raymond is, on information and belief, in imminent danger of dissipation.

192.

The facts giving rise to Unlimited's fraud demands the imposition of an equitable lien to protect Raymond's property by removing that property from Unlimited's control and ordering Unlimited to immediately deposit not less than

$750,000 in the registry of this Court.

## COUNT XIV

### *ACCOUNTING*

193.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

194.

The claim made in this Count XIV is made in the alternative and without waiving Plaintiff' right to a claim for rescission of the Agreements as set forth in Count One herein.

195.

An equitable accounting is granted when an accounting at law is inadequate. Herring v. Standard Guar. Ins. Co., 238 Ga. 261, 232 S.E.2d 544 (1977).

196.

The Franchise Agreement does not afford Raymond a contractual right at law to an accounting.

197.

The relationship between Defendants and Raymond is so sufficiently completed and without an adequate remedy at law at to require an equitable

accounting.

198.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused Raymond unnecessary trouble and expense so as to necessitate an accounting.

## COUNT XV

### *ATTORNEYS' FEES & EXPENSES OF LITIGATION*

199.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

200.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused Raymond unnecessary trouble and expense so as to warrant an award of the expenses of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. § 13-6-11.

## COUNT XVI

### *PUNITIVE DAMAGES*

201.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

50

202.

The conduct of Defendants constitutes such willful misconduct, malice, wantonness, oppression, and that entire want of care so as to raise a presumption of a conscious indifference to the consequences of her actions, entitling Raymond to an award of punitive damages.

WHEREFORE, Plaintiff prays as follows:

1.  A trial by a jury of twelve be had on all counts so triable.

2.  In accordance with Count I, this Court rescind the Agreements and award judgment in favor of Raymond and against Defendants.

3.  In the alternative to rescinding the Agreements, this Court:

    a.  In accordance with Count I, award judgment in favor of Raymond and against Defendants for fraud.

    b.  In accordance with Count II, award judgment in favor of Raymond and against Defendants for negligent misrepresentation.

    c.  In accordance with Count III, award judgment in favor of Raymond and against Defendants for constructive fraud.

    d.  In accordance with Count VIII, award judgment in favor of Raymond and against Defendants for breach of contract.

    e.  In accordance with Count IX, award judgment in favor of Raymond

and against Defendants for conversion.

    f.  In accordance with Count X, award judgment in favor of Raymond and against Defendants for unjust enrichment.

    g.  In accordance with Count IV, award judgment in favor of Raymond and against Defendants for tortious misconduct and negligence per se.

    h.  In accordance with Count V, award judgment in favor of Raymond and against Defendants for conspiracy.

    i.  In accordance with Count IX, award judgment in favor of Raymond and against Defendants for conversion.

    j.  In accordance with Count X, award judgment in favor of Raymond and against Defendants for unjust enrichment.

4. In accordance with Count VI, this Court award judgment against Defendants for violations of Georgia RICO.

5. In accordance with Count VII, this Court award judgment against Defendants for Federal RICO.

6. In accordance with Count XI, this Court award judgment in favor of Raymond and against Shonda M. Mickel individually for fraud.

7. In accordance with Count XII, this Court award judgment in favor of Raymond and against Defendants, imposing a constructive trust of not less

than $750,000 of Raymond's money that is held by Defendants, with said monies to be deposited in the Court's registry, together with all profits of Defendants derived from the investment of these monies.

8. In accordance with Count XIII, this Court award judgment in favor of Raymond and against Defendants, imposing an equitable lien of not less than $750,000 of Raymond's money that is held by Defendants, with said monies to be deposited in the Court's registry, together with all profits of Defendants derived from the investment of these monies.

9. In accordance with Count XIV, this Court require an accounting for all monies in the bank account(s) controlled by Defendants.

10. In accordance with Count XV, this Court award Raymond his attorneys' fees, court costs, and litigation expenses.

11. In accordance with Count XVI, this Court award to Raymond general, special, compensatory, punitive, and other damages, and as supplemented in an amount to be determined by the enlightened conscience of an impartial jury.

12. This Court enter such other and further relief as it deems just and proper under the circumstances.

Respectfully submitted this 10th day of May 2022.

/s/ Robert Arkin
Robert Arkin, Esq.
Georgia Bar No. 021575

*Counsel for Plaintiff Andrew W. Raymond*

ROBERT ARKIN LLC d/b/a Arkin Law
50 Hurt Plaza SE, Suite 1444
Atlanta, GA  30303-2946
(T) 404-220-8500
(F) 855-804-9334
Email: robert@arkin.law

## VERIFICATION

I, Andrew W. Raymond, declare as follows:

1.     I am a resident of Texas and submit myself to the jurisdiction of the U.S. District Court for the Northern District of Georgia, Atlanta Division.

2.     If called upon to testify, I would testify competently as to the matters set forth in the foregoing Verified Complaint for Damages and Equitable Relief.

3.     I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint and Equitable Relief concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding.  28 U.S.C. § 1746.

Executed on May 4, 2022.

Andrew W. Raymond

Subscribed and sworn before me on
this the 4th day of May, 2022.

NOTARY PUBLIC
My Commission expires: 2·12·2025


VANESSA MONIQUE ZENDEJAS
Notary Public, State of Texas
Comm. Expires February 12, 2025
Notary ID 129302967

55

## **CERTIFICATION OF FONT TYPE AND SIZE**

The undersigned counsel hereby certifies that the foregoing has been

prepared with Times New Roman 14-Point Font, as approved in LR 5.1C.

**EXHIBIT A**



# FRANCHISE AGREEMENT

### BETWEEN

## UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.

### AND

### Andrew W. Raymond



## 241-A West General Screven Way, Hinesville Georgia 31313
## Office: (912) 368-2962    Fax: (877) 328-8544
## Email: info@unlimitedtaxes.com    Website: www.unlimitedtaxes.com

INITIAL

**SMM**

| Unlimited | Franchisee |
|-----------|------------|

# UNLIMITED
## TAXES & MORE
### FRANCHISING COMPANY, L.L.C.®

# FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (the "Agreement") is made and entered into the **25th** day of **October**, 20 **21** (the "Effective Date"), by and between **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®**, a Georgia limited liability company with its principal business address at **804 Jay Street, Hinesville, Georgia 31313** ("we," "us," "our," or "Unlimited"), and _____**Andrew W. Raymond**_____, whose place of organization, form, and principal business address are set forth on Schedule A to this Agreement ("you," "your," or "Franchisee").

The length of this Franchise Agreement is **five (5)** years. You will receive a **$ 150,000.00** penalty for each year that your Franchise Agreement is not completed.

## RECITALS

A. We own the right to use, and to license others to use, the trademark "**UNLIMITED TAXES & MORE, INC.®**" and trademarks, trade names, service marks, logotypes, trade dress, and other commercial symbols related to the trademark "**Unlimited Taxes & More**" (collectively, the "Marks").

B. We have acquired and have further developed a unique concept and system for the operation of businesses that offer tax preparation services, credit repair services, check cashing, grant writing, money transfers, and other products, services, merchandise, and miscellaneous items we designate (collectively, the "Products and Services"), using our designs, business formats, training, expertise, know-how, confidential information, and trade secrets; our rules, guidelines, standards, specifications, plans, programs, and procedures; and our advertising and promotional materials (all of which, together with the Marks, are referred to collectively in this Agreement as the "System"), all of which System is subject to change, improvement, and further development from time to time.

C. You have applied to us for a franchise to use the System, and we desire to grant you a franchise to use the System.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and commitments set forth in this Agreement, the parties hereby agree as follows:

## 1. DEFINITIONS.

1.1. **Kiosk.** "Kiosk" shall mean, collectively, the place or places from which you operate your Franchised Business, as shown on Schedule A to this Agreement.

1.2. **Royalty Due Date.** "Royalty Due Date" shall mean: (i) every Tuesday; or (ii) such other date as we may specify.

## 2. FEES.

2.1. **Initial Franchise Fee.** You will pay us an initial franchise fee (the "Initial Franchise Fee") when you sign this Agreement. Your initial Franchise Fee will be $ _____**0.00**_____ (Non-Refundable).

2.2. **Royalty.**

    2.2.1. You will pay us a continuing royalty (the "Royalty") based on a percentage (the "Royalty Percentage") of your Gross Tax Preparation Fees (as defined in Section 2.3 of this Agreement). Your Royalty Fee will be _____**30.00**_____ percent of Gross Tax Preparation Fees.

    2.2.2. The Initial Franchise Fee structure and Royalty Percentage structure described in Section 2.1, Section 2.2.1, and Schedule A of this Agreement are on a per-Kiosk basis. If you have more than one Kiosk, the Kiosks may have different Initial Franchise Fees and Royalty Percentages.

UTM / FA / 11951.2 / 0914
© 2014 The Johnson Franchise Law Firm, LLC

**INITIAL**
**SMM**
Unlimited    Franchisee

2 | P a g e

**2.3.**   **Gross Tax Preparation Fees**. Gross Tax Preparation Fees shall include all revenue related to the sale of products and performance of services in, at, about, from, or through the Kiosk, whether for cash or credit, and regardless of collection in the case of credit, and income of every kind and nature related to the Kiosk, including without limitation insurance proceeds and condemnation awards for loss of sales, profits, business, or otherwise; provided, however, that "Gross Tax Preparation Fees" shall not include: (i) revenues from sales taxes or other add-on taxes that you collect from customers and duly transmit to the appropriate taxing authority; and (ii) the retail value of complimentary services, discounts, trade-outs, cash refunds to customers, coupons used by customers, and credit card fees (collectively, the "Comps"), up to a maximum of three percent (3%) of Gross Tax Preparation Fees in the aggregate. In no event may you exclude more than three percent (3%) of the Kiosk's Gross Tax Preparation Fees for Comps.

   **2.3.1.**   You will provide the Products and Services at and from your Kiosk only, except as we may expressly authorize in writing. If you provide products and services away from the Kiosk, with or without our consent, you will include the revenues from them in the Kiosk's Gross Tax Preparation Fees.

   **2.3.2.**   All exchanges in kind or barter transactions pursuant to which you furnish goods, services, or intangible benefits in exchange for or in anticipation of goods, services, or intangible benefits to be provided will, for the purpose of determining Gross Tax Preparation Fees, be valued at the greater of the full retail value of the goods, services, and intangible benefits provided by you or to you.

**2.4.**   **Payment of Amounts Owed.**

   **2.4.1.**   **Royalty Due Date**. Royalty Fees will be automatically deducted by Refund Transfer Bank. All Direct E-Files and other services will be billed directly for commission payment.

   **2.4.2.**   **Method of Payment; Timing**. You will pay all amounts you are obligated to pay us: (i) in one lump sum; (ii) by automatic debit, in certified funds, or in such other manner as we may direct; (iii) in United States dollars; and (iv) so that we actually receive such payment by the end of the date such payment is due.

   **2.4.3.**   **Payment Processing Fees**. If banks, credit card companies, or other payment processors charge us a fee for processing any payment you make to us, you will reimburse us the amount of such fee, so that we actually receive such reimbursement by the end of ten (10) days after we request such reimbursement.

   **2.4.4.**   **Deduction or Setoff**. You will pay all amounts you are obligated to pay us without deduction, setoff, or abatement. You will not, on the grounds of any alleged breach by us of this Agreement or for any other reason, withhold payment of any such amount.

   **2.4.5.**   **Collection Charge; Interest**. If you fail to pay any amount you are obligated to pay us so that we actually receive the payment by the end of the date such payment is due, you will pay us, so that we actually receive such payment by the end of five (5) days after our request for payment:

      **2.4.5.1.** The amount of the payment; plus

      **2.4.5.2.** A collection charge (the "Collection Charge") equal to the greater of: (i) Two Hundred and Fifty Dollars and no/cents ($250.00) per delinquent payment; or (ii) our actual costs of collection, which costs may include, without limitation, our employee costs, overhead, and attorneys' fees and costs; plus

      **2.4.5.3.** Interest on the overdue amount equal to the lesser of: (i) the daily equivalent of eighteen percent (18%) per annum (the "Contract Rate"); or (ii) the highest rate then permitted by Law (the "Default Rate").

   **2.4.6.**   **Deficient Payment**. Our acceptance of any payment that is less than the full amount you owe us: (i) will not be construed as a satisfaction of the amount you owe us; and (ii) will not affect our right to collect the full amount you owe.

   **2.4.7.**   **Payments are Non-Refundable**. All amounts you pay to us or our affiliates are non-refundable except in the case of overpayment or similar error.

# 3.   GRANT OF FRANCHISE; INITIAL TERM; RENEWAL.

**3.1.**   **Grant of Franchise**. We hereby grant to you, and you hereby accept from us, a franchise (the "Franchise") to use the System and to offer the Products and Services at the Kiosk (collectively, your "Franchised Business").

**3.2.**   **Initial Term**. This Agreement will commence on the Effective Date and will continue in effect for a period of one (1) years thereafter (the "Initial Term").

INITIAL

SMM

Unlimited        Franchisee

3.3. **Renewal**. You may renew the Franchise for an unlimited number of consecutive one (1) year terms (each such term being referred to as a "Renewal Term," and the Initial Term, together with all Renewal Terms, being referred to collectively as the "Term"), provided that:

3.3.1. You deliver written notice (the "Renewal Notice") fewer than six (6) months but more than three (3) months before the end of the Initial Term of your intent to renew;

3.3.2. We are, at the times material to the renewal, offering franchises at the location of the Kiosk where you desire such renewal;

3.3.3. You have been and remain in compliance with this Agreement and all other agreements related to the Franchised Business to which you and we are parties;

3.3.4. You enter into our then-current form of franchise agreement;

3.3.5. You execute a general release of any and all claims against us, our affiliates, and our and their directors, officers, shareholders, partners, members, employees, agents, and attorneys; and

3.3.6. You pay us a renewal fee (the "Renewal Fee") in the amount of _____ $ 0.00 _____ (NON-REFUNDABLE).

## 4. TERRITORY.

4.1. **Territory**. You will have a territory (your "Territory"). Your Territory will consist of the shell of the store in which your Kiosk is located.

4.2. **Your Rights to Territory**. Except as otherwise set forth in this Agreement, we will not, and we will not authorize any other person or entity to, use the Marks to operate a business similar to your Franchised Business in the Territory.

4.3. **Reserved Rights**. This Agreement authorizes you to use the System in the operation of your Franchised Business at and through your Kiosk only, and does not grant you any market, territorial, or other rights, except as set forth in this Agreement. We reserve all rights related to the System, the Products and Services, and the Territory, that we do not expressly grant you in this Agreement.

4.4. **Limitations**. The consuming public is best served by free and fair competition in the marketplace. As a result, you may solicit customers inside or outside your Territory, and you may offer the Products and Services to customers from any area, as you deem appropriate, without payment of any additional compensation to us or to any other franchisee of ours. We and our other franchisees may solicit customers from inside your Territory, and may offer the Products and Services to customers from inside your Territory, all without payment of any compensation to you. Outside your Territory, we and any of our affiliates may operate, and may authorize others to operate, businesses similar to your Franchised Business, in any geographic area we and they deem appropriate, all without payment of any compensation to you. You may not offer the Products or Services by means of the Internet, a toll-free telephone line, or any other means of solicitation, without our express prior written consent.

## 5. SITE SELECTION; SITE IMPROVEMENTS.

5.1. **Site Selection**. You and we will agree on the location of your Kiosk before we sign this Agreement. We will show the location of your Kiosk on Schedule A to this Agreement.

5.2. **Site Improvements**. You will effect the site improvements and install the furniture, fixtures, equipment, décor, and signage at the Kiosk that we require. We will consult with you regarding the design, equipping, and decorating of the Kiosk; provided, however, it will be your sole responsibility to design, equip, decorate, ready, and open the Kiosk.

5.3. **Opening Date**. You will begin offering Products and Services under the System by the date shown on Schedule A to this Agreement (the "Opening Date").

5.4. **Closing Date**. You will cease offering Products and Services under the System on the date shown on Schedule A to this Agreement (the "Closing Date").

## 6. TRAINING AND ASSISTANCE.

6.1. **Manager Training**. We will provide you with our initial manager training (the "Manager Training"). You may send up to three (3) attendees to the Manager Training during the Term at no additional charge.

6.2. **Additional Training**. We may develop additional training (the "Additional Training"). If we develop such Additional Training, your participation in such training will be voluntary. We reserve the right to charge a reasonable fee for

INITIAL
SMM          _dr_
Unlimited    Franchisee

such Additional Training.

6.3. **Location of Training; Costs**. We will conduct all training at training facilities we designate. You will be responsible for all costs related to your attendance at any training we offer.

# 7. MARKS.

7.1. **Ownership**. You agree that: (i) there is valuable goodwill in the Marks; (ii) as between you and us, we own the Marks and all goodwill related to them; (iii) you have no right, title, or interest in or to the Marks, or the associated goodwill, except the limited, revocable, non-exclusive license to use the Marks as set forth in this Agreement; and (iv) you will not contest our ownership or the validity of the Marks at any time during or after the Term of this Agreement.

7.2. **Terms of Use**. You agree that: (i) you will operate your Franchised Business using the Marks as its principal identifier; (ii) you will use and display the Marks, signage, and trade dress we specify in relation to your Franchised Business; (iii) your use of the Marks, and all goodwill related to such use, will inure to our benefit; (iv) you will not use or register any Mark, any part thereof, or anything similar, as part of your name or the name of any entity; (v) you will not use or register any Mark, any part thereof, or anything similar, as a part of any Internet domain name, social media site name, or like name; (vi) you will not use any Mark in any manner that may injure us; and (vii) you will not take any other action that would harm any Mark, or our rights thereto.

7.3. **Defense**. You will notify us promptly in writing of any potentially infringing uses by others, and of any suits or claims against you, related to the Marks, and will cooperate fully with us in the defense of the Marks. If you have provided such notice, we will indemnify you against all direct damages (but not for loss of future revenue and consequential, special, multiplied, exemplary, or punitive damages) and expenses you incur due to any infringement claim any third party brings against you that arises out of your proper use of the Marks. We have sole discretion over the defense of any Mark and the settlement of any litigation related to any Mark. You will take no action with regard to such defense, and will not initiate any suit or proceeding related to the Marks, without our prior express written consent.

7.4. **Identification**. You will: (i) identify yourself as an independent franchisee of ours in all public records where such disclosure is permitted; (ii) place on all business forms and checks of the Franchised Business the legend "An Independent Franchisee of **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®**" or such other language as we may specify from time to time; and (iii) post in a public location in any facility where you meet with suppliers or the public, a sign stating as follows:

This **UNLIMITED TAXES & MORE, INC.®** office is independently owned and operated by [your full legal name] under a franchise granted by **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®**, [our then-current address], [our then-current telephone number].

7.5. **Control of Advertising**. We may provide you with access to certain of our advertising materials. We shall have the right to protect the goodwill related to the Marks; thus, you will use only advertising and marketing materials that we have provided to you or that we have approved in writing in advance. If you desire to use advertising and marketing materials that we have not provided to you or that we have not previously approved, you must submit such advertising and promotional materials to us for our consent prior to such use. If we do not disapprove the use of such materials within ten (10) days after we receive them, they will be deemed approved. You will not conduct any advertising or marketing activities that fall outside our guidelines.

7.6. **Changes to Marks**. We will have the right at any time, on notice to you, to make additions to, deletions from, and changes in the Marks at our absolute discretion, and you agree to adopt and use any and all such additions, deletions, and changes pursuant to our direction, at your sole cost and expense. We shall not be liable to you or any other party for any loss, expense, liability, damage, or damages, however characterized, for any such additions to, deletions from, or changes to the Marks.

# 8. CONFIDENTIAL OPERATIONS MANUALS.

8.1. **Contents; Compliance**. We will provide you, on loan, with one copy of our Confidential Operations Manuals (the "Manuals"). The Manuals may consist of one or more operations manuals and other manuals, and such additions to,

UTM / FA / 11951.2 / 0914
© 2014 The Johnson Franchise Law Firm, LLC

INITIAL
SMM        dP
Unlimited    Franchisee

5 | P a g e

deletions from, and modifications to them as we may publish from time to time. The Manuals may contain our guidelines and recommendations for your operation of the Franchised Business. If we provide the Manuals in hard copy, you will keep your copy of them current. If there is any conflict between your copy of the Manuals and our master copy, our master copy will control.

8.2.   **Ownership**. We are the sole owner of the Manuals and all goodwill related to them. We have common-law copyrights as to the Manuals. You may use the Manuals solely in connection with the Franchised Business and only during the Term of the Franchise. You may not reproduce, copy, license, sell, or otherwise disclose, or permit others obtaining access to the Manuals by or through you to reproduce, copy, license, sell, or otherwise disclose, any portion of the Manuals, except for forms and similar items included in them for the express purpose of copying.

## 9. OUR RESPONSIBILITIES.

9.1.   **General Responsibilities**. In addition to the other services and assistance described in this Agreement, we will provide you with the following services and assistance, at no additional charge except as set forth in this Agreement:

    9.1.1.   Access to advertising and promotional programs and material we or our designated advertising agency may develop for the System.

    9.1.2.   Guidance regarding prices for the Products and Services. You will not be obligated to accept any such guidance: you will have the sole right to determine the prices you charge.

    9.1.3.   Periodic or continuing individual or group assistance and consultation we may develop addressing matters related to your Franchised Business, provided by personal visit, telephone, newsletter, bulletin, or electronic media, as we deem appropriate; and such bulletins, brochures, and reports as we may publish from time to time regarding our plans, policies, developments, and activities.

    9.1.4.   A listing of your Franchised Business on any Internet site we maintain that lists our franchisees to the same extent as we list other franchisees generally.

9.2.   **Consultation**. You may request that we provide you with on-site assistance ("Consultation"). Such Consultation may include, without limitation, specialized advice related to the operation of your Franchised Business, on-site reviews of your operations, the furnishing of training or retraining, and other assistance you may request. We are not obligated to provide such Consultation, but we may do so as we deem appropriate. You will pay us a fee, in such amounts as you and we agree on, for such Consultation.

9.3.   **Right to Access; Inspection**. We may at any time during normal business hours, on not less than forty-eight (48) hours prior notice to you, enter any location where you conduct or maintain any aspect of the Franchised Business and monitor your procedures, evaluate your performance, and inspect your facilities, to determine the effect of such procedures, performance, and facilities on the goodwill related to the Marks. You will provide us with all assistance we may reasonably request in the course of such monitoring, evaluation, and determination.

## 10. CONFIDENTIAL INFORMATION; RESTRICTIVE COVENANTS.

10.1.   **Definitions**. As used in this Agreement:

    10.1.1.   "Confidential Information" means any information that we disclose to you and that we designate as confidential; or that, by its nature, would reasonably be expected to be held in confidence or kept secret. Without limiting the generality of this definition of "Confidential Information," all the following shall be conclusively presumed to be Confidential Information, whether or not we designate them as such: (i) our standard operating procedures; (ii) our marketing programs; (iii) our training programs and the material contained in them; (iv) our cost information; and (v) other information we give to you in confidence, except where such information is a Trade Secret.

    10.1.2.   "Trade Secret" means information that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. Without limiting the generality of this definition of "Trade Secrets," you agree that all the following shall be conclusively presumed to be Trade Secrets, whether or not we designate them as such: (i) all customer lists; (ii) our advertising, marketing, and public relations strategies; (iii) our marketing analyses; and (iv) products and services that we propose to add to our Product or Service offerings, but that we have not yet added.

UTM / FA / 11951.2 / 0914
© 2014 The Johnson Franchise Law Firm, LLC

INITIAL
SMM        JR
Unlimited    Franchisee

6 | P a g e

10.1.3. The terms "Confidential Information" and "Trade Secret" do not include: (i) information generally known to the trade or the public at the time we disclose it to you; (ii) information that becomes known to the trade or the public after we disclose it to you, unless it becomes known due to your breach of this Agreement; (iii) information you can prove was known to you at the time we disclosed it to you; or (iv) information disclosed pursuant to a subpoena or court order.

10.2. **Protection of Confidential Information and Trade Secrets**. You acknowledge and agree that the Confidential Information and Trade Secrets are not, by definition, generally known in the trade; that they are beyond your present skill and experience; and that for you to develop such Confidential Information and Trade Secrets on your own would be expensive, time-consuming, and difficult. You further acknowledge and agree that: (i) gaining access to the Confidential Information and Trade Secrets is a primary reason why you are entering into this Agreement; (ii) the Confidential Information and Trade Secrets will provide you with a competitive advantage; (iii) the Confidential Information and Trade Secrets will be economically valuable to you; (iv) we have a reasonable, legitimate need to protect the confidentiality of our Confidential Information and the secrecy of our Trade Secrets; (v) the provisions of this Section 10.2 are reasonable and are the minimum provisions necessary to protect our legitimate interests and the legitimate interests of our other franchisees, including without limitation the integrity of our and their businesses, and the investment that we and they have made in our and their businesses; and (vi) we would not enter into this Agreement with you without your agreement to be bound by the provisions set forth in this Section 10.

10.2.1. **Confidentiality**. You covenant, warrant, represent, and agree that:

10.2.1.1. You will not, during the term of this Agreement: (i) appropriate or use any Confidential Information or Trade Secret for any purpose other than the operation of your Franchised Business in compliance with this Agreement; or (ii) disclose or reveal any portion of the Confidential Information or Trade Secrets to any other person or entity except as we expressly authorize in a writing signed by an officer of ours.

10.2.1.2. You will not, for two (2) years after the termination or expiration of this Agreement: (i) appropriate or use any Confidential Information for any purpose; or (ii) disclose or reveal any portion of the Confidential Information to any other person or entity.

10.2.1.3. You will not, at any time after the termination or expiration of this Agreement: (i) appropriate or use any Trade Secret for any purpose; or (ii) disclose or reveal any Trade Secret to any other person or entity.

10.2.1.4. You will not copy, duplicate, record, or otherwise reproduce any of the Confidential Information or Trade Secrets, in whole or in part; store such Confidential Information or Trade Secrets in a computer retrieval or data base; or otherwise make such Confidential Information or Trade Secrets available to any third party, except as we expressly authorize in a writing signed by an officer of ours.

10.2.1.5. If a dispute arises as to whether particular information is Confidential Information or a Trade Secret, you will bear the burden of proving that such information is outside the ambit of "Confidential Information" or "Trade Secrets" subject to this Agreement.

10.3. **Restrictive Covenant**. You covenant, warrant, represent, and agree that:

10.3.1. You will not, during the term of this Agreement, individually or jointly with others, directly or indirectly, by, through, on behalf of, or in conjunction with, any person or entity: (i) own, maintain, operate, engage in, or have any interest in, any business that offers for sale, sells, or delivers products or services that are the same as or similar to the Products and Services that we authorize you to offer for sale, sell, or deliver, as such Products and Services are modified from time to time, or any product or service confusingly similar thereto (a "Competing Activity"), except as we expressly authorize in a writing signed by an officer of ours, except that you may passively own or hold less than five percent (5%) of the shares of any publicly-traded business engaged in a Competing Activity; (ii) act as a director, officer, shareholder, partner, member, employee, independent contractor, consultant, principal, agent, or proprietor, or participate or assist in the establishment or operation of, directly or indirectly, any business engaged in a Competing Activity; or (iii) divert or attempt to divert any business from us or our other franchisees.

10.3.2. You will not, beginning at the expiration or termination of this Agreement and for two (2) years thereafter or two (2) years after a court of competent jurisdiction enters an order enforcing this Section 10.3 of this Agreement, whichever occurs last, within a ten (10) mile radius of the Kiosk, individually or jointly with others, directly or indirectly, by, through, on behalf of, or in conjunction with, any person or entity: (i) own,

UTM / FA / 11951.2 / 0914
© 2014 The Johnson Franchise Law Firm, LLC

INITIAL
SMM        dR
Unlimited   Franchisee

7 | P a g e

maintain, operate, engage in, or have any interest in, any business engaged in a Competing Activity, except as we expressly authorize in a writing signed by an officer of ours, except that you may passively own or hold less than five percent (5%) of the shares of any publicly-traded business engaged in a Competing Activity; (ii) act as a director, officer, shareholder, partner, member, employee, independent contractor, consultant, principal, agent, or proprietor, or participate in the establishment or operation of, directly or indirectly, any business engaged in a Competing Activity; or (iii) divert or attempt to divert any business from us or our other franchisees.

10.3.3. In the event of any dispute or litigation arising out of or related to this Section 10.3 of this Agreement, you hereby direct any third party construing this Agreement, including without limitation any court, mediator, master, or other party acting as a trier of fact or law:

10.3.3.1. To conclusively presume that the restrictions set forth in this Section 10.3 are reasonable and necessary.

10.3.3.2. To conclusively presume that this Section 10.3 was made freely and voluntarily by and between you and us, as two independent businesses, in an arms-length commercial transaction between skilled and experienced business operators.

10.3.3.3. To conclusively presume that the restrictions set forth in this Section 10.3 will not prevent you from earning a livelihood, whether during the term of this Agreement or after its termination or expiration.

10.3.3.4. To conclusively presume that any breach of the terms of this Section 10.3 was accompanied by the misappropriation and inevitable disclosure of our Confidential Information, Trade Secrets, and other methods and procedures.

10.3.3.5. To construe this Section 10.3 under laws governing distribution contracts between commercial entities in an arms-length business transaction, and not under laws governing contracts of employment.

10.4. <u>Unfair Competition; Remedies; No Contrary Representations.</u>

10.4.1. You acknowledge and agree that: (i) any breach by you of Sections 10.1, 10.2, or 10.3 of this Agreement shall be conclusively presumed to constitute unfair competition; and (ii) Sections 10.1, 10.2, and 10.3 of this Agreement are our reasonable effort under the circumstances to maintain the confidentiality of our Confidential Information and the secrecy of our Trade Secrets.

10.4.2. You acknowledge and agree that in the event of any breach of Sections 10.1, 10.2, or 10.3, we would be irreparably injured and without adequate remedy at law. Therefore, in the event of a breach or a threatened or attempted breach of any provision of Sections 10.1, 10.2, or 10.3, you agree that we are entitled, in addition to any other remedies we may have under this Agreement, at law, in equity, or otherwise, to a preliminary and permanent injunction and a decree for specific performance of the terms of Sections 10.1, 10.2, and 10.3 of this Agreement without the necessity of showing actual or threatened damage and without being required to furnish a bond or other security.

10.4.3. You covenant, warrant, represent, and agree that you will not: (i) make or raise any claim, crossclaim, counterclaim, affirmative defense, or demand; (ii) commence, or cause or permit to be commenced; (iii) prosecute, or cause or permit to be prosecuted; or (iv) assist or cooperate in the commencement or prosecution of, any suit or action at law or in equity, any arbitration or like proceeding, or any administrative or agency proceeding, against or related to us, our affiliates, or our or their directors, officers, shareholders, partners, members, employees, agents, or attorneys, or the predecessors, successors, heirs, and assigns of any or all of them, alleging, claiming, or asserting anything that is contrary to this Section 10 of this Agreement.

10.5. <u>Personal Covenants</u>. If you are a business entity, you will, simultaneously with your execution of this Agreement, cause your directors, officers, shareholders, partners, members, and management employees (collectively, your "Covenanting Personnel"), to execute the Personal Covenants attached to this Agreement as Schedule B. If there is any change or transfer in ownership interest in you, or if you elect or appoint other directors, officers, or management employees, you will require the person or entity acquiring such ownership or management interest to sign Schedule B to this Agreement as a condition precedent to obtaining such interest, and will provide us with a copy of Schedule B so executed.

UTM / FA / 11951.2 / 0914
© 2014 The Johnson Franchise Law Firm, LLC

INITIAL
SMM                 dR
Unlimited      Franchisee

8 | P a g e

## 11. INDEMNIFICATION; INSURANCE.

11.1. <u>Indemnification</u>. You will defend, indemnify, and hold harmless us, our affiliates, and our and their directors, officers, shareholders, partners, members, employees, agents, and attorneys, and the predecessors, successors, heirs, and assigns of any and all of them, from and against any and all loss, expense, liability, or damage, including attorneys' fees, arising out of or related to the Franchised Business, within five (5) days after demand for such defense or indemnification.

11.2. <u>Insurance</u>. You will maintain, at your expense, the insurance we prescribe.

## 12. TRANSFER OF FRANCHISE.

12.1. <u>Transfer of Franchise</u>. The Franchise is personal to you and you will not, nor will you attempt to, sell, assign, delegate, transfer, or encumber any of your rights or obligations under this Agreement, without our prior written consent. Any purported sale, assignment, delegation, transfer, or encumbrance in violation of this Section 12.1 will be voidable by us. If you are a business entity, this Section 12.1 will be deemed violated on any sale, pledge, assignment, transfer, or encumbrance of your assets, voting stock, or ownership interest. In addition, if you are a partnership, the terms of this Section 12.1 will be deemed violated on the removal or addition of any general partner. You will disclose to us on Schedule A of this Agreement the names of all your owners, and will give us prompt notice of any additions to, deletions from, or changes to such owners.

12.2. <u>Assignment by Us</u>. We may assign all of our rights and obligations under this Agreement. We will not be required to obtain your consent in connection with any such transfer or assignment. Following the effective date of such transfer or assignment, you will look solely to the transferee or assignee, and not to us, for the performance of all obligations contained in this Agreement.

## 13. BREACH AND TERMINATION.

13.1. <u>Termination by You</u>. You may terminate this Agreement if we commit a breach of this Agreement and do not cure such breach within thirty (30) days after we receive notice of such breach from you.

13.2. <u>Termination by Us: No Opportunity to Cure.</u> We have the right to terminate this Agreement without affording you any opportunity to cure the breach, effective on delivery of notice of termination to you:

13.2.1. If you copy or permit others to copy any portion of the Manuals, except for forms and similar items included in them for the express purpose of copying, or fail to take all necessary precautions to ensure the confidentiality of the Manuals' contents.

13.2.2. If you fail to comply fully with all applicable federal, state, and locate statutes, regulations, ordinances, codes, case law, judgments, injunctions, writs, and other laws (collectively, the "Laws") related to the Franchised Business, unless there is a bona fide dispute as to the violation or legality of any applicable Law and you promptly resort to a court or other appropriate forum having jurisdiction to contest such violation or illegality.

13.2.3. If you abandon the Franchised Business, or if the Franchised Business ceases regular operations for a period of five (5) consecutive days or any shorter period that indicates your intent to discontinue the Franchised Business.

13.2.4. If you engage in conduct that, in our determination, materially impairs the goodwill related to the Marks.

13.2.5. If we deliver three (3) notices of breach to you, regardless of whether you cured such breaches.

13.2.6. If you: (i) become insolvent by reason of an inability to pay debts as they come due; (ii) are adjudicated bankrupt; (iii) file a petition for bankruptcy protection; (iv) are the debtor in an involuntary bankruptcy petition that is not dismissed within sixty (60) days; (v) are the debtor in an assignment for the benefit of creditors that is not dismissed within sixty (60) days; (vi) are the subject of a voluntary or involuntary petition for reorganization or similar proceeding that is not dismissed within sixty (60) days; (vii) are the subject of a petition for appointment of a receiver, permanent or temporary, that is not dismissed within sixty (60) days; (viii) are the judgment debtor in any final judgment in the amount of $10,000 or more and such judgment remains unsatisfied of record for more than sixty (60) days; (ix) have your bank accounts, property, or receivables attached and such attachment proceedings are not dismissed within sixty (60) days; (x) have an

INITIAL

SMM                 <u>JP</u>

Unlimited      Franchisee

execution levied against your business or property and such execution is not dismissed within sixty (60) days; or (xi) are the subject of any suit to foreclose any lien or mortgage related to the Franchised Business or the property thereof, and such suit is not dismissed within sixty (60) days.

13.3. <u>Termination by Us: Opportunity to Cure.</u> We have the right to terminate this Agreement for any breach of this Agreement not specifically enumerated in Section 13.2, above, after ten (10) days' notice to you to cure the breach and your failure to cure such breach to our reasonable satisfaction within such time, without further notice or opportunity to cure.

# 14. OBLIGATIONS ON EXPIRATION, TERMINATION, OR CLOSING DATE.

On the expiration or termination of this Agreement, or at the end of the Closing Date, you will, without demand by us:

14.1. Immediately vacate the Kiosk, leaving the Kiosk in substantially the condition in which you received it, normal wear and tear excepted.

14.2. Pay us and our affiliates the full amount you owe us and them, so that we and they actually receive such payment within five (5) days after such expiration, termination, or Closing Date.

14.3. Immediately cease to use the Marks.

14.4. Immediately return all hard copies of the Manuals, together with all reproductions of the Manuals or any portion of the Manuals, to us.

14.5. Immediately cease to hold yourself out as a franchisee or former franchisee of ours.

# 15. MISCELLANEOUS.

15.1. <u>Improvements to System</u>. If you develop any improvements to any aspect of the System: (i) such improvements will be deemed a work made for hire, notwithstanding any designation of you in this Agreement as an independent contractor or franchisee; and (ii) you will immediately convey any such improvements to us, and such improvements will become our sole and exclusive property.

15.2. <u>Relationship</u>. You and we acknowledge and agree that: (i) you are an independent contractor; and (ii) we have no control or right of control over the details of the means and methods you choose to conduct the Franchised Business, including but not limited to the amounts you charge; the hiring, training, discipline, or termination of your employees and agents; and the compensation, working hours, conditions, or day-to-day activities of such persons, except as they may violate this Agreement; (iii) neither party is the legal representative or agent of, or has the power to obligate or supervise the affairs of, the other for any purpose; and (iv) nothing in this Agreement creates a partnership, joint venture, agency, fiduciary, or employment relationship.

15.3. <u>Notices</u>. All communications required or permitted to be given under this Agreement will be in writing and will be deemed to have been duly given: (i) when received in person; (ii) one (1) business day after being sent (and receipted for) by commercial courier service for next business day delivery; (iii) five (5) days after being deposited in the United States mail for certified delivery, return receipt requested, postage prepaid; or (iv) on the intended recipient's refusal to accept delivery of any communication given pursuant to (i) through (iii), above, which refusal shall be deemed constructive delivery effective on the earlier of the date of such refusal or the times set forth in (i) through (iii). Notice to us will be addressed as set forth in the caption of this Agreement, to the attention of our Manager. Notice to you will be addressed to your principal place of business shown on Schedule A to this Agreement to the attention of your Manager. Either party may designate another address at any time by written notice to the other.

15.4. <u>Time</u>. Time is of the essence to the performance of all obligations of the parties to be performed under this Agreement.

15.5. You must Exclusively use UT 1040 tax preparation software. Failure to use tax preparation software as a part of your franchise business will result to a $ 50,000.00 penalty.

15.6. <u>Resolution of Disputes</u>.

15.6.1. *Litigation.* In the event of any dispute arising out of or related to this Agreement, including without limitation any dispute arising out of or related to the making of this Agreement, such dispute shall be resolved exclusively through litigation. Such litigation shall be conducted on an individual, not a class-wide, basis. No litigation under this Agreement may be consolidated with any other litigation involving us and any other person without our prior written consent.

INITIAL
SMM
Unlimited     Franchisee

15.6.2. *Contractual Repose and Limitations Periods.* A party that has any claim against the other shall have the lesser of: (i) two (2) years from the date such claim accrued (the "Repose Period"); or (ii) one (1) year from the date the first party became aware of, or with reasonable diligence should have become aware of, the facts giving rise to such claim (the "Limitations Period"), within which to settle such claim or to commence a legal action with respect to such claim, or such claim shall be barred. A counterclaim, crossclaim, or affirmative defense shall be barred if the Repose Period or Limitations Period, as applicable, would bar such counterclaim, crossclaim, or affirmative defense, if the basis for such counterclaim, crossclaim, or affirmative defense were raised as an independent "claim." Notwithstanding anything set forth in this Section 15.5.2 to the contrary, such Repose Period and Limitations Period shall not: (a) apply to; (b) preclude claims, counterclaims, crossclaims, or affirmative defenses regarding; or (c) otherwise bar or limit, our rights arising out of or related to amounts you owe us.

15.6.3. *Waiver or Delay.* Except as otherwise set forth in Section 15.5.2 of this Agreement, no waiver or delay by either party in requiring strict compliance with respect to any obligation of this Agreement, or in the exercise of any right or remedy provided in this Agreement, and no custom or practice at variance with the requirements of this Agreement: (i) shall constitute a waiver or modification of any such obligation, right, remedy, or requirement; (ii) shall preclude, affect, or impair the exercise of any such right or remedy; (iii) shall preclude, affect, or impair the right to require strict compliance with any obligation or requirement set forth in this Agreement; or (iv) shall preclude, affect, or impair enforcement of any obligation, right, remedy, or requirement provided in this Agreement. All remedies under this Agreement, at law, in equity, or otherwise, afforded to either party, shall be cumulative and not alternative, and may be exercised simultaneously or sequentially in any order.

15.6.4. *Governing Law.* Except as otherwise set forth in this Agreement, the existence, validity, construction, enforcement, and sufficiency of performance of this Agreement shall be determined exclusively in accordance with, and governed exclusively by, the laws of the State of Georgia applicable to agreements made and to be entirely performed within the State of Georgia, which laws shall prevail in the event of any conflict of laws. Notwithstanding the foregoing, all litigation hereunder, to the extent governed by the United States Trademark Act of 1946, shall be governed by such Trademark Act of 1946.

15.6.5. *Forum, Venue, and Jurisdiction.* In the event of any litigation arising out of or related to this Agreement, including without limitation any litigation arising out of or related to the making of this Agreement, the exclusive forum and venue for such litigation shall be a state or federal court having jurisdiction over the subject matter in or for the city or county where our principal place of business is located. You hereby irrevocably accept and submit to, generally and unconditionally, for yourself and with respect to your property, the exclusive jurisdiction of any such court in any such action or proceeding and hereby waive all defenses based on jurisdiction, venue, and forum non conveniens.

15.6.6. *WAIVER OF TRIAL BY JURY.* YOU AND WE HEREBY WAIVE TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATED TO: (i) THIS AGREEMENT; AND (ii) THE RELATIONSHIP BETWEEN THE PARTIES.

15.6.7. *Attorneys' Fees.* In the event of any dispute arising out of or related to this Agreement, including without limitation any dispute arising out of or related to the making of this Agreement, the non-prevailing party shall pay the prevailing party, on demand, such prevailing party's costs, including without limitation such prevailing party's reasonable attorneys' fees and costs, and further including without limitation such prevailing party's reasonable attorneys' fees and costs of appeal, and further including without limitation such prevailing party's reasonable attorneys' fees and costs of collection, all of which shall be taxed as costs, so that the prevailing party actually receives such amounts by the end of ten (10) days after demand therefor. In the event of any breach of this Agreement, the breaching party shall pay the non-breaching party such non-breaching party's costs related to such breach, including without limitation such non-breaching party's reasonable attorneys' fees and costs, and further including without limitation such non-breaching party's reasonable attorneys' fees and costs of collection, so that the non-breaching party actually receives such amounts by the end of ten (10) days after demand therefor.

15.6.8. *Continuation after Termination or Expiration.* The provisions set forth in this Section 15.5 shall remain in full force and effect after the termination or expiration of this Agreement.

15.7. If you receive any type of Pre-Season Advances and fail to utilize UT 1040 software, you will be penalized $ 75,000.00.

15.8. **Force Majeure.** In the event of an act of God, terror, war, insurrection, civil commotion, strike, lockout, or embargo; or lack of water, materials, power, or telephone transmissions reasonably necessary in connection with your Franchised Business; or fire, hurricanes, unavoidable casualties, and any other occurrence, event, or condition beyond the reasonable control of you or us, whichever is applicable (a "Force Majeure"), you or we, as applicable, will be relieved of your or our respective obligations to the extent that you or we are necessarily prevented, or materially hindered or delayed, in such performance during the period of such Force Majeure.

INITIAL

SMM

Unlimited    Franchisee

## 16. ACKNOWLEDGMENTS.

16.1. <u>Revenue and Profits</u>. YOU ACKNOWLEDGE AND AGREE THAT WE AND OUR AFFILIATES MAY DERIVE REVENUE AND PROFITS FROM PURCHASES YOU MAKE FROM US AND OUR AFFILIATES. YOU FURTHER ACKNOWLEDGE AND AGREE THAT WE AND OUR AFFILIATES MAY ENTER INTO AGREEMENTS WITH THIRD PARTIES UNDER WHICH WE AND OUR AFFILIATES MAY DERIVE REVENUE AND PROFITS, AND OTHER BENEFITS, SUCH AS REBATES, DISCOUNTS, AND ALLOWANCES, AS A RESULT OF CONSIDERATION YOU PAY TO SUCH THIRD PARTIES.

16.2. <u>Business Risks</u>. You agree that you have conducted an independent investigation of the business contemplated by this Agreement, recognize that it involves business risks, and recognize that making a success of such business depends largely on your own business abilities.

16.3. <u>No Other Representations</u>. You acknowledge and agree that neither we nor any of our officers, members, employees, agents, or attorneys has made, nor have you received, any oral or written: (i) information different from or contrary to the information contained in this Agreement; or (ii) earnings claims or financial performance representations related to this Agreement.

## 17. CONSTRUCTION OF AGREEMENT.

17.1. <u>Reasonable Business Judgment</u>. We acknowledge and agree that we will, and you acknowledge and agree that we may, use Reasonable Business Judgment in the exercise of our rights, discharge of our obligations, and exercise of our discretion under this Agreement and in all circumstances where we are required to give our consent, unless this Agreement expressly provides some other standard. "Reasonable Business Judgment" shall mean that our determinations and choices shall prevail, even if other alternatives are also reasonable or arguably preferable, if we intend to benefit, or are acting in a way that could benefit, the System (by, for example, enhancing the value of the Marks, increasing franchisee or customer satisfaction, or increasing our financial strength); or if we intend to prevent harm to, or are acting in a way that could prevent harm to, the System (by, for example, minimizing possible confusion as to the Marks or the location of any business, protecting the public, or protecting your or our personnel). You agree to this concept of Reasonable Business Judgment in acknowledgment of the fact that we should have at least as much discretion in administering the System as a corporate board of directors has in directing a corporation and because the long-term interests of the System, all franchisees and owners of franchised businesses in the System, and we and our owners, taken together, require that we have the latitude to exercise Reasonable Business Judgment. We shall not be required to consider a franchisee's particular economic or other circumstances or to slight our own economic or other business interests when we exercise Reasonable Business Judgment. You acknowledge and agree that: (i) we have a legitimate interest in seeking to maximize the return to our equity holders; and (ii) the fact that we benefit economically from an action shall not be relevant to showing that we did not exercise Reasonable Business Judgment. Neither you nor any third party (including without limitation any court, mediator, master, or other party acting as trier of fact or law) may substitute his, her, or its judgment for our Reasonable Business Judgment. In a given situation, you shall have the burden of establishing, by clear and convincing proof, that we failed to exercise Reasonable Business Judgment.

17.2. <u>Merger; Entire Agreement</u>. This Agreement, including the schedules hereto, sets forth the entire agreement between you and us, fully superseding any and all prior negotiations, agreements, representations, or understandings between you and us, whether oral or written, related to the subject matter of this Agreement. You expressly agree that there are no oral or other written agreements, "side-deals," arrangements, or understandings between you and us except as set forth in this Agreement.

17.3. <u>Partial Invalidity</u>. If any part of this Agreement is declared invalid or unenforceable for any reason, such part will be modified to the extent necessary to make it enforceable; or, if it cannot be so modified, then severed, and the remaining terms of this Agreement will remain in full force and effect.

17.4. <u>Interpretation</u>. The section headings in this Agreement are inserted for convenience only and will not affect the construction of this Agreement. Both parties are skilled and experienced business professionals, and both have contributed to the negotiation and drafting of this Agreement. As a result, in no event may any adverse construction of this Agreement be attributed to either party as the drafting party. The Recitals of this Agreement are a material part of this Agreement and shall in no event be considered prefatory material or mere surplusage.

UTM / FA / 11951.2 / 0914
© 2014 The Johnson Franchise Law Firm, LLC

INITIAL
SMM
Unlimited    Franchisee

12 | P a g e

**17.5.** <u>Survival of Obligations</u>. All obligations of this Agreement, whether yours or ours, that expressly or by their terms require performance after the termination or expiration of this Agreement, or that by their nature would reasonably be expected to continue in effect after termination or expiration of this Agreement, will continue in full force and effect after and notwithstanding its termination or expiration, until they are satisfied in full or by their nature expire.

**17.6.** <u>Use of Any Other Tax Preparation Software</u>. Franchisee is prohibited from using any other Tax Preparation Software while in agreement with Unlimited Taxes & More, Inc. In the event this take place, you will receive a ___$ 7,500.00___ per year penalty until your Franchise Agreement expires.

**IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the Effective Date.**

| UNLIMITED TAXES & MORE, INC. - FRANCHISEE | | UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC. | |
|---|---|---|---|

*Andrew Raymond*
Andrew Raymond (Oct 25, 2021 11:13 CDT)

| SIGNATURE | | SIGNATURE | |
|---|---|---|---|
| PRINT: | Andrew W. Raymond | PRINT: | SHONDA M. MICKEL |
| TITLE: | Franchisee | TITLE: | DIRECTOR OF OPERATIONS |
| DATE: | 10/25/2021 | DATE: | 10/25/2021 |

THANKS FOR JOINING TEAM UNLIMITED

UTM / FA / 11951.2 / 0914
© 2014 The Johnson Franchise Law Firm, LLC

INITIAL
SMM    *dR*
Unlimited    Franchisee

13 | Page

# SCHEDULE A
# GENERAL INFORMATION

1. ☑ Store Front ☐ Kiosk ☐ Home-Based ☐ Mobile ☐ Year Round ☐ Seasonal

Address: _____ 6730 Brentwood Stair Road _____

City: _____ Fort Worth _____ State: _____ Texas _____ Zip Code: _____ 76112 _____

2. ☐ Store Front ☐ Kiosk ☐ Home-Based ☐ Mobile ☐ Year Round ☐ Seasonal

Address: _____

City: _____ State: _____ Zip Code: _____

3. ☐ Store Front ☐ Kiosk ☐ Home-Based ☐ Mobile ☐ Year Round ☐ Seasonal

Address: _____

City: _____ State: _____ Zip Code: _____

4. ☐ Store Front ☐ Kiosk ☐ Home-Based ☐ Mobile ☐ Year Round ☐ Seasonal

Address: _____

City: _____ State: _____ Zip Code: _____

5. ☐ Store Front ☐ Kiosk ☐ Home-Based ☐ Mobile ☐ Year Round ☐ Seasonal

Address: _____

City: _____ State: _____ Zip Code: _____

Contract Begins the __25th__ day of _____ October _____ 20 __21__

Contract Ends the __31st__ day of _____ December _____ 20 __26__

Franchise Fee: _____ $ 0.00 _____ (Non Refundable)   Yearly Renewal Fee: _____ $ 10,000.00 _____ (Non Refundable)

| UNLIMITED TAXES & MORE, INC. - FRANCHISEE | UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC. |
|---|---|
| *Andrew Raymond* | |
| Andrew Raymond (Oct 25, 2021 11:13 CDT) | |
| SIGNATURE | SIGNATURE |

| PRINT: | Andrew W. Raymond | | PRINT: | SHONDA M. MICKEL |
|---|---|---|---|---|
| TITLE: | Franchisee | | TITLE: | DIRECTOR OF OPERATIONS |
| DATE: | 10/25/2021 | | DATE: | 10/25/2021 |

# SCHEDULE B
## PERSONAL CONVENANTS

INITIAL

SMM

Unlimited     Franchisee

UTM / FA / 11951.2 / 0914
© 2014 The Johnson Franchise Law Firm, LLC

1 | P a g e   Schedule B

**To Be Signed by All Persons Having an Equity Interest in Franchisee; and
Franchisee's Directors, Officers, and Management Employees**

Each undersigned ("you") agrees that:

1.  All capitalized terms used but not defined in these Personal Covenants shall have the same meanings as are ascribed to them in that certain **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** Franchise Agreement between **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** (the "Company") and _____**Andrew W. Raymond**_____ (the "Franchisee") dated the __25th__ day of ____**October**____, 20__21__ (the "Franchise Agreement").

2.  You are an equity holder of Franchisee, or you are a director, officer, or management employee of Franchisee; and as such, you expect to or will gain a direct personal benefit from the Franchise Agreement.

3.  As an inducement to Company to enter into the Franchise Agreement, and in consideration of the direct and personal benefits you will derive from the Franchise Agreement, you agree that: (i) you have read and understand all the provisions of Section 10 of the Franchise Agreement; (ii) you will be personally bound by all of the obligations and covenants of Franchisee contained in Section 10 as if such obligations and covenants were made and given personally by you directly to Company; and (iii) such obligations and covenants are fair and reasonable and will not deprive you of your livelihood.

4.  If any provision contained in Section 10 of the Franchise Agreement is held by a court of competent jurisdiction to be unenforceable as applied to you, then such unenforceable provision may be modified by such court to the extent necessary to render it enforceable, and if it cannot be so modified, it shall be severed and the remainder of Section 10 shall remain in full force and effect.

5.  These personal covenants shall be governed by the internal laws of the State of Georgia.

**You do hereby execute and deliver this agreement effective as of the date set forth beneath your signature or, if there is no such date, effective as of the date of the Franchise Agreement:**

| UNLIMITED TAXES & MORE, INC. - FRANCHISEE | | UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC. | |
|---|---|---|---|
| *Andrew Raymond* | | | |
| Andrew Raymond (Oct 25, 2021 11:13 CDT) | | | |
| **SIGNATURE** | | **SIGNATURE** | |
| **PRINT:** | **Andrew Raymond** | **PRINT:** | **SHONDA M. MICKEL** |
| **TITLE:** | **Franchisee** | **TITLE:** | **DIRECTOR OF OPERATIONS** |
| **DATE:** | **10/25/2021** | **DATE:** | **10/25/2021** |

INITIAL

SMM              *dR*
Unlimited     Franchisee

2 | P a g e   Schedule B

# SCHEDULE C
## PLACEMENT AND OPERATING PROCEDURES

INITIAL

SMM

Unlimited          Franchisee

UTM / FA / 11951.2 / 0914
© 2014 The Johnson Franchise Law Firm, LLC

1 | P a g e   Schedule C

## Placement Provisions: (Kiosk Locations)

1.  I understand that the placement fee for the tax season is for opportunity to conduct a tax preparation business for a limited period from January to April only.

2.  I understand that every store's floor plan is different and that I will have to work with the location manager to best determine each store placement. The final say is the store managers.

3.  I understand that every location may have different zoning and code requirements, and or business licensing; it is my responsibility to comply with all requirements.

4.  I understand that there may be conflicts in local leases prohibiting tax services inside the vendor partner. Where possible, I will investigate prior to requesting a location, and if a conflict arises, I will work with **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** to find a suitable replacement location.

5.  I understand that the store demographics provided by **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** is for review purpose only, no guarantee in performance is made. I will visit each location to make my own determination as to store demographics.

6.  I understand a location can become disqualified at any time before tax season starts, and anytime during tax season. I will work with **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** to minimize the impact by find a suitable replacement location.

7.  I understand I will be required to purchase a kiosk kit from an approved third-party vendor for each location.

8.  The option to extend to the Early MOVE IN (December 1st) inside the vendor partner will require an additional payment of _____ $ 0.00 _____ ; to be paid by November 1st. The Vendor Partner / **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** have the right to deny any extension based on non-compliance with Placement Rules.

## Operating Rules: (Kiosk Locations)

1.  I understand that if I fail to operate in an ethical professional manner, **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** can pull my placement inside the vendor partner and no refund will be given. If there is ANY THEFT or FRAUD; your placement will be pulled immediately!!!!

2.  I understand that all business conducted from the vendor partner kiosk is exusive to **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC®**. I will not operate or use any tax software/service except those provided by **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC®**. If I violate this policy all remaining fees will be forfeited and legal charges will be filed.

3.  Client is permitted to hang marketing materials and pass out flyers in accordance with policies that govern the location, and maintain a clean and organized kiosk at all times.

4.  **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** will provide guidance on product pricing; however, each business owner will determine their own local pricing. This should reflect local markets.

5.  Each owner should work to develop a good working relationship with the vendor partner's personnel.

6.  A $500.00 penalty for failure to remove tax kiosk on schedule.

7.  As the local owner and operator, I know I need to market my business. I understand that the vendor partner and **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** brands and name are trademarked and I will not use without prior approval.

**INITIAL**

| SMM | JR |
|-----|-----|
| Unlimited | Franchisee |

8.  I agree to conduct criminal background checks on all employees, agents, representatives that will be working at the vendor partner location.

9.  I will be responsible to provide Internet Service to my kiosk, including all office equipment needed to run a tax office.

10. I will send a copy of the PTIN Document, Driver License to **UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.®** for every preparer that will be working inside the vendor partner location.

**By signing this agreement, you are stating that the above terms are fully accepted and agreed upon.**

| UNLIMITED TAXES & MORE, INC. - FRANCHISEE | | UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC. | |
|---|---|---|---|
| *Andrew Raymond* <br> Andrew Raymond (Oct 25, 2021 11:13 CDT) | | | |
| **SIGNATURE** | | **SIGNATURE** | |
| **PRINT:** | Andrew W. Raymond | **PRINT:** | SHONDA M. MICKEL |
| **TITLE:** | Franchisee | **TITLE:** | DIRECTOR OF OPERATIONS |
| **DATE:** | 10/25/2021 | **DATE:** | 10/25/2021 |

*THANKS FOR JOINING*

**TEAM UNLIMITED**

INITIAL <br> SMM      *AR* <br> Unlimited   Franchisee

**<u>Exhibit B</u>**

# SOFTWARE LICENSE AGREEMENT

**TAX YEAR(s)**   20 __21__  to  20 __26__

**LOCATION TYPE:**

☑ Store Front   ☐ Mobile   ☐ Kiosk/Satellite

**ACCOUNT TYPE:**

☑ Franchise Sub-Service Bureau
☐ Franchise Affiliate

**SOFTWARE PACKAGE:** (Include Federal and All States)

☑ License 1 Complimentary
☑ Additional Feeder Sites: $ __395.00__ per license.
☐ Unlimited Licenses: $_____.

**FEE(s):**   Bank & Technology Fees Excluded (those are charged by the bank and software providers)

Transmission Fee: $ __99.00__          E-File/Doc Prep Fee: $ __99.00__
Service Bureau Fee: $ __99.00__
Direct E-file Fee: $ __275.00__ per client (non-bank products; invoiced by UNLIMITED TAXES & MORE, INC.)

**ROYALTY FEES:**   (Percentage is calculated on preparation fees ONLY)

__30.00__ % of tax preparation fees per client.

## UNLIMITED TAX PROTECT

Affiliate must use UNLIMITED TAX PROTECT on each bank product client in the event or an audit or an error is made on the tax return. The fee is $ 44.99 per funded bank product. You may upcharge product up to $ 50.00.

Notwithstanding the defined fees within this agreement, ERO and all applicable ERO's will be assessed a technology fee for any electronically transmitted document. ERO understands and agrees that any marketing relating to Demo Software will be processed through UNLIMITED TAXES & MORE, INC.'s marketing request method within the Prospecting section of UNLIMITED TAXES & MORE, INC. UNLIMITED TAXES & MORE, INC. will pay for the Demo, Shipping & Handling within reasonable volume. Should the ERO need additional Demo's or other marketing material, ERO and UNLIMITED TAXES & MORE, INC. shall address the cost on a case-by-case basis.

# EXHIBIT "B"

The software will consist of the following modules, options and pricing.

## Bank Products and Options

In order for an EDC/ERD Check to be considered ("Funded"), Bank must receive the tax refund from the IRS for that requested EDC/ERD Check in an amount greater than or equal to all authorized fees. ERO understands and agrees it can determine and set its own ERO fee. ERO also understands and agrees that the ERO fee must be used for the EDC/ERD Checks, not one or the other, and the fee must be the same for both. ERO may apply a different ERO fee per ERO. ERO understands and agrees that there is a UNLIMITED TAXES & MORE, INC. bank processing fee for all funded bank transactions conducted through this ERO. ERO understands and agrees that the ERO will be able to choose a bank upon time of "enrollment". ERO also understands and agrees that any other applicable fees and incentives that relate to bank products will be disclosed at that time.

**UNLIMITED TAXES & MORE. INC. - FRANCHISEE**

| | |
|---|---|
| **DATE** | 10/25/2021 |
| **TITLE** | Franchisee |
| **PRINTED NAME** | Andrew W. Raymond |

**SIGNATURE**  *Andrew Raymond*
Andrew Raymond (Oct 25, 2021 11:13 CDT)

**UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.**

| | |
|---|---|
| **DATE** | |
| **TITLE** | DIRECTOR OF OPERATIONS |
| **PRINTED NAME** | SHONDA M. MICKEL |

**SIGNATURE**

# **Exhibit C**



## AFFILIATE SOFTWARE LICENSE AGREEMENT

## PREPARED FOR:   Andrew W. Raymond dba Unlimited Taxes & More



WELCOME ABOARD! WE ARE HAPPY THAT YOU HAVE FINALLY DECIDED TO USE UNLIMITED TAXES & MORE, INC. TAX PREPARATION SOFTWARE. WE ARE CONFIDENT THAT YOUR EXPERTISE AND DEDICATION CAN CONTRIBUTE SIGNIFICANTLY TO OUR COMPANY'S GOALS AND CONTINUED SUCCESS!

ONCE AGAIN, A WARM WELCOME TO YOU AND WE HOPE YOU HAVE A GOOD "STAY."

SINCERELY,

TEAM UNLIMITED SOFTWARE ENROLLMENT DEPARTMENT

### 241-A West General Screven Way, Hinesville, Georgia 31313
### Office: (912) 368-2963 ~ Fax: (877) 328-8544

**UNLIMITED**
**TAXES & MORE, INC.**®
"THE AFFORDABLE PROFESSIONAL ALTERNATIVE"

**241-A West General Screven Way, Hinesville, Georgia 31313**
**Office: (912) 368-2963    Fax: (877) 328-8544**

# AFFILIATE SOFTWARE LICENSE AGREEMENT

THIS IS A LICENSE AGREEMENT (the "Agreement") made and entered into by and between UNLIMITED TAXES & MORE, INC., a Georgia company with its principal business address at 241-A West General Screven Way, Hinesville, Georgia 31313 ("we", "us", "our", or "UNLIMITED"), and the individual(s) listed below whose place of organization, form, and principal business address are set forth within this Agreement ("you", "your", or "Franchisee").

## RECITALS

WHEREAS, UNLIMITED TAXES & MORE, INC. is in the business of transmitting income tax return data and is the owner of certain software products (hereafter referred to as "Software") which are more fully described in Exhibit A attached hereto and incorporated herein; and WHEREAS, UNLIMITED TAXES & MORE, INC. has agreements in place with its applicable bank(s); to offer refund checks ("EDC/ERD Checks") to individuals whose income tax returns are filed electronically with the Internal Revenue Service ("IRS") and who are entitled to a tax refund ("Qualified Individuals")

UNLIMITED TAXES & MORE, INC. desires to license the Software, which is more fully described in Exhibit A, to ERO, as an extension of UNLIMITED TAXES & MORE, INC.

WHEREAS, ERO desires to utilize the services of UNLIMITED TAXES & MORE, INC. to transmit tax return data of electronically filed and accepted tax returns by the IRS to the Bank. The Bank will provide EDC/ERD Check's to ERO's. NOW, THEREFORE, in consideration of the promises made herein, the legal sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **AGREEMENT**
   The ERO will be responsible for the completion of the IRS Forms 8453, 1040, 1040A and 1040EZ, which shall include, but is not limited to,
   a.  The routing transit number of the Bank;
   b.  The deposit account number for the taxpayer used by Bank;
   c.  The designation of the type of account with the Bank as a "Checking" account; and
   d.  Obtaining the taxpayers consent to have their refund directly deposited into an account by executing the appropriate Form 8453 or Form 8879.

   ERO shall submit information for electronically filed and accepted tax returns by the IRS ("Information") to UNLIMITED TAXES & MORE, INC. in a file format defined by UNLIMITED TAXES & MORE, INC. UNLIMITED TAXES & MORE, INC. shall electronically transmit the Information to the Bank. Bank will process the Information received from UNLIMITED TAXES & MORE, INC. and provide the appropriate acknowledgement file based upon an EDC/ERD Check.

   UNLIMITED TAXES & MORE, INC. agrees to transmit information from ERO for their EDC/ERD Check requests until October 15th of the applicable tax year.

2. **FEE SETTLEMENT**
   a.  Bank will withhold from the proceeds disbursed to Qualified Individuals its fee for issuing a EDC/ERD Check or any other fees including, without limitation, electronic filing fees, processing fees, technology fees, ERO fees, tax preparation fees and additional handling fees ordinarily charged as designated by UNLIMITED TAXES & MORE, INC., Bank, ERO's. Bank will deposit the withheld fees as designated by UNLIMITED TAXES & MORE, INC., Bank, and ERO into their respective bank account. Bank will distribute the withheld fees by ACH direct deposit once a week, or by check on the 1st and 15th of each month as designated by UNLIMITED TAXES & MORE, INC., Bank, and ERO. UNLIMITED TAXES & MORE, INC. and Bank will not be liable to ERO under this Agreement for the collection of any fees.

3. **LICENSE**
   UNLIMITED TAXES & MORE, INC. grants to ERO, and ERO accepts from UNLIMITED TAXES & MORE, INC., a non-transferable license. Any sublicense granted were under by service bureau to ERO's shall be on terms and conditions consistent with this Agreement. No license for any other use may be granted to other entities. All licenses provided for herein shall apply to UNLIMITED TAXES & MORE, INC.'s Software provided to ERO and ERO for the purposes described herein irrespective of the name or title given said Software.

   The parties agree that ERO shall purchase exclusively from UNLIMITED TAXES & MORE, INC. the specific Software, as set forth in the relevant Exhibit B and C, as is necessary to meet the needs of ERO and ERO.

   The parties also agree that ERO shall hereafter purchase exclusively from UNLIMITED TAXES & MORE, INC. as many additional copies of the Software as ERO determines it may need. For purposes of this Agreement any reference to the Software shall also include any copies of the Software purchased by ERO now or hereafter. Use of copies purchased now or hereafter shall be governed by the terms and conditions of this Agreement.

4. **AGREEMENT TERM**
   Unless otherwise terminated or canceled as provided herein, the term hereof, of the licenses and sublicenses granted hereunder shall commence on UNLIMITED TAXES & MORE, INC. signature date of this Agreement and expire on _____December 31_____, 20__26__ (Initial Term). ERO understands and agrees that upon the expiration of the initial term, this Agreement will automatically renew for successive periods of ___five (5) years___ terms unless ERO provides written notice to UNLIMITED TAXES & MORE, INC. of its intent to terminate the Agreement upon expiration of the initial term or subsequent terms and is provided sixty (60) days prior to the renewal term.

5. **DOCUMENTATION**
   UNLIMITED TAXES & MORE, INC. may provide ERO with electronic marketing materials that may be used for the purpose of advertising UNLIMITED TAXES & MORE, INC. products and services. Such marketing material may not be modified without the express written consent of UNLIMITED TAXES & MORE, INC.

6. **SUPPORT**

UNLIMITED TAXES & MORE, INC. will provide support services to ERO at no additional cost.

7. **TITLE TO SOFTWARE SYSTEMS**

The Software and all documentation hereunder and all copies thereof are proprietary to UNLIMITED TAXES & MORE, INC. and title thereto remains in UNLIMITED TAXES & MORE, INC. UNLIMITED TAXES & MORE, INC. is the developer and copyright owner of the Software and all documentation hereunder and UNLIMITED TAXES & MORE, INC. has the right, title, and interest to the Software, its source code and documentation.

8. **STATUS OF THE PARTIES**

In performing their respective responsibilities pursuant to this Agreement, UNLIMITED TAXES & MORE, INC. and ERO are in the position of independent contractors. This Agreement is not intended to create, nor does it create and will not be constructed to create, the relationship of a partnership, joint venture, franchise, employee, servant, representative or agent of UNLIMITED TAXES & MORE, INC.

9. **INDEMNITY**

UNLIMITED TAXES & MORE, INC. at its own expense shall defend and hold ERO fully harmless against any action asserted against ERO to the extent that it is based on a claim that use of the Software owned by UNLIMITED TAXES & MORE, INC. within the scope of this Agreement infringes any patent, copyright, license or other property right or proprietary right of any third party. ERO shall promptly notify UNLIMITED TAXES & MORE, INC. in writing of any such claim. If as a result of any claim of infringement against any patent, copyright, license or other property right or proprietary right of any third party, ERO is enjoined from using the Software, or if UNLIMITED TAXES & MORE, INC. believes that the Software is likely to become the subject of a claim of infringement, UNLIMITED TAXES & MORE, INC. at its option and expense may procure the right for ERO to continue to use the Software, or replace or modify the Software so as to make it non-infringing. If neither of these two options is commercially practicable, UNLIMITED TAXES & MORE, INC. may discontinue the License granted herein on thirty (30) days written notice. This section survives the termination of this Agreement.

10. **ACCOUNTING**

ERO shall keep records in sufficient detail and allow investigation of all its operations hereunder as may be necessary to determine ERO's compliance with this Agreement, and accuracy of the reports and the statements that may be requested by UNLIMITED TAXES & MORE, INC. from time to time. UNLIMITED TAXES & MORE, INC. agrees to give written notice to ERO before exercising its right to inspect ERO's records. ERO shall utilize its own billing system for billing ERO's that have purchased software through the respective ERO. All software purchases will be entered into Real Time for the applicable software purchase including but not limited to, ERO's credit card information for payment and all applicable information relating to the applicable ERO. Interest at the rate of eighteen percent (18%) per annum shall be due on any payment thirty - (30) days outdated.

11. **TAXES**

ERO shall, in addition to the other amounts payable under this Agreement, pay sales and use taxes, which it customarily pays in transactions of this nature. UNLIMITED TAXES & MORE, INC. shall not be responsible for (i) any taxes on ERO's income or net worth; or (ii) any fines, penalties or interest or charges of any kind owed due to ERO's failure to timely pay any taxes.

12. **WARRANTIES**

UNLIMITED TAXES & MORE, INC. and ERO warrant that they are duly authorized to enter into this Agreement. UNLIMITED TAXES & MORE, INC. hereby warrants that UNLIMITED TAXES & MORE, INC. is the owner of the Software and UNLIMITED TAXES & MORE, INC. has the legal right to grant to ERO the License granted in this Agreement without violating any rights of any third party, and there is currently no actual or threatened suit by any such third party based on an alleged violation by UNLIMITED TAXES & MORE, INC. of such right. ERO warrants that UNLIMITED TAXES & MORE, INC. shall not be liable to ERO and ERO for defects in materials or workmanship. ERO warrants that UNLIMITED TAXES & MORE, INC. shall not be liable to ERO for defects in the representations made by ERO as to the performance of the Software or Tax Software. UNLIMITED TAXES & MORE, INC. warrants that the Software will substantially perform according to its documentation.

13. **TERMINATION**

UNLIMITED TAXES & MORE, INC. or ERO may terminate this Agreement upon a breach by the other party of any one or more of the material terms and conditions of the Agreement. The party in breach must receive written notification from the other party of the breach and, unless within thirty (30) days of receipt of said written notification either the breach is cured or a satisfactory resolution has been agreed upon in writing, the party giving such notice may terminate the Agreement. Upon termination of this agreement, ERO will use reasonable efforts to destroy or return to UNLIMITED TAXES & MORE, INC. all production copies of the Software. Any termination under this Agreement shall not affect either party's ability to pursue any other remedy existing at law or in equity for such default and/or termination.

14. **HOLD HARMLESS**

ERO expressly agrees to hold UNLIMITED TAXES & MORE, INC. harmless and to indemnify UNLIMITED TAXES & MORE, INC. from any and all claims, costs, expenses, damages, losses, or fees, including costs and reasonable attorneys' fees, incurred as a result of or arising out of any negligent acts or negligent failure to act by ERO, its employees or agents. UNLIMITED TAXES & MORE, INC. expressly agrees to hold ERO harmless and to indemnify ERO from any and all claims, costs, expenses, damages, losses, or fees, including costs and reasonable attorneys' fees, incurred as a result of or arising out of any negligent acts or negligent failure to act by UNLIMITED TAXES & MORE, INC., its employees or agents.

15. **LIMITATION OF LIABILITY**

Under no circumstances shall UNLIMITED TAXES & MORE, INC. be liable to ERO or any other party for any loss of profit or indirect, consequential, incidental, special or punitive damages arising out of or in connection with this Agreement or other operation of this Software or the Tax Software, even if UNLIMITED TAXES & MORE, INC. has been advised of the possibility of such damages. Notwithstanding the foregoing, under no circumstances shall UNLIMITED TAXES & MORE, INC. have any liability whatsoever for any claim arising from or relating to this Agreement or its performance in excess of the amounts paid by UNLIMITED TAXES & MORE, INC. hereunder during the twelve (12) months immediately preceding the filing of such claim.

16. **CREDIT REQUIREMENTS**

ERO's are subject to BANK's Underwriting Guidelines. The BANK may have in place a requirement of credit review for the ERO or ERO's who request to process bank products.

17. **LIMITATION OF ACTIONS**

No action, regardless of form, arising out of or relating to this Agreement, the Software or the Tax Software, may be brought by either party more than one (1) year after the cause of action has accrued, except any action for nonpayment.

**18. ARBITRATION**

UNLIMITED TAXES & MORE, INC. and ERO agree to undertake good faith negotiations, whether directly or with the assistance of a qualified and mutually acceptable mediator, to resolve any dispute between them of any type arising from this Agreement. In the event that the parties are unable to resolve the dispute through such negotiations or mediation, it shall be submitted to arbitration under the rules of the American Arbitration Association, or such other rules as the parties may agree. Not more than three (3) arbitrators shall be selected by mutual agreement of the parties, and such arbitrators shall be selected for their familiarity with the technical subject matter of this Agreement and their familiarity with intellectual property law. The arbitration proceedings shall take place in such location as the parties may mutually agree. The findings of the arbitrators shall be final and binding on the parties. Notwithstanding the foregoing, any party who believes in good faith that its' patent, copyright, trade secret or other intellectual property rights are being infringed, misappropriated or used without authorization by another party or its licenses, subcontractors or age UNLIMITED TAXES & MORE, INC. shall be free to commence an action in any court of competent jurisdiction to seek preliminary or permanent equitable relief and such other legal or equitable relief as the court may allow.

**19. CONFIDENTIALITY**

ERO expressly agrees that this Agreement and all software products and documentation provided by UNLIMITED TAXES & MORE, INC. to ERO for the use with the Software are to be treated as confidential and treated with the utmost secrecy. The parties expressly acknowledge that in the course of UNLIMITED TAXES & MORE, INC.'s and ERO's performance hereunder, UNLIMITED TAXES & MORE, INC. and ERO may learn certain confidential, patent, copyright, business, trade secret, proprietary or other like information. Anything in the Agreement to the contrary notwithstanding, UNLIMITED TAXES & MORE, INC. and ERO expressly agree that they will keep strictly confidential and in the utmost secrecy any such information of UNLIMITED TAXES & MORE, INC. or ERO, or any of their subsidiaries, vendors or suppliers, which UNLIMITED TAXES & MORE, INC. or ERO learns. ERO expressly further agrees that they shall return to UNLIMITED TAXES & MORE, INC. upon UNLIMITED TAXES & MORE, INC.'s request any such information and copies thereof. The terms of this paragraph shall survive the termination of this Agreement.

**20. PROPRIETARY NOTICES**

ERO agrees that any copies of the Software which it makes pursuant to this Agreement shall bear all copyright, trademark and other proprietary notices included therein by UNLIMITED TAXES & MORE, INC. and, except as expressly authorized herein, ERO shall not distribute same to any third party (other than ERO's) without UNLIMITED TAXES & MORE, INC.'s prior written consent.

**21. NOTICES**

All notices required or permitted to be given by one party to the other under this Agreement shall be sufficient if sent by certified mail, return receipt requested, to the respective addresses set forth below or to such other address as the party to receive the notice has designated by notice to the other party. Cancellation of contract will incur a penalty of $ 7,500.00 per year that your contract is not completed.

**22. NON-COMPETE**

It is expressly agreed that ERO's will not directly sell, market, service and/or license software to UNLIMITED TAXES & MORE, INC.'s clients, customers, tax preparers and/or ERO's (hereinafter referred to collectively as Customers") during the term of this Agreement. In addition, ERO agrees that it will not, for a period of one year following the termination of this Agreement, directly or indirectly call on, solicit, or take away, or attempt to call on, solicit, or take away any of the Customers of UNLIMITED TAXES & MORE, INC. with whom ERO became acquainted during ERO'S association with UNLIMITED TAXES & MORE, INC. whether for ERO or for any other person, firm or corporation. ERO/Affiliate/Tax Preparer agrees to use UNLIMITED TAXES & MORE, INC. software exclusively during his/her contract period. In the event he or she breaches, all preparation fees, sub service bureau fees, rebates, incentives, add-on fees, and bonuses will be forfeited.

**23. GENERAL**

Each party acknowledges that it has read this Agreement, understands it, and agrees to be bound by its terms, and further agrees that this Agreement, Exhibit A, Exhibit B and Exhibit C represent the complete and exclusive statement of the agreement between the parties, which supersede all prior proposals, understandings and all other agreement, oral and written, between the parties relating to this Agreement. This Agreement may not be modified or altered except by written instrument duly executed by authorized representatives of both parties. The laws of the State of Georgia hereunder shall govern this Agreement and performance without reference to choice of law issues. All legal proceedings relating to this Agreement shall be maintained exclusively in courts sitting with the State of Georgia, County of Liberty. If any provision of this Agreement is held invalid or otherwise unenforceable, the enforceability of the remaining provisions shall not be impaired thereby. Anything in the Agreement to the contrary notwithstanding, ERO may not delegate or assign its duties under the Agreement to any other entity, including an entity which affiliates or merges with or acquires ERO, except when such delegation or assignment is approved in advance by UNLIMITED TAXES & MORE, INC. in writing, which approval UNLIMITED TAXES & MORE, INC. may in its sole discretion grant or deny. Either party shall have the right to collect from the other party its reasonable expenses incurred in enforcing this Agreement, including costs and attorneys' fees. The failure of either party to exercise any right provided for herein shall not be deemed a waiver of any right thereunder. Headings are for the convenience of the parties and shall not be used to construe the terms and conditions of the Agreement.

| COMPANY | | EFFECTIVE DATE |
|---|---|---|
| Unlimited Taxes & More | | 10/25/2021-12/31/2026 |
| NAME | | ADDRESS |
| Andrew W. Raymond | | 6326 Brentwood Stair Road |
| EMAIL ADDRESS | | CITY, STATE AND ZIP CODE |
| lyfewdrew@yahoo.com | | Fort Worth, TX 76112 |
| EIN/SSN | EFIN | CONTACT NUMBER |
| 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 | 224543 | (817) 609-2624 |

AFFILIATE / TAX PREPARER SIGNATURE *Andrew Raymond*
Authorized Signature Andrew Raymond (Oct 25, 2021 11:13 CDT)       DATE   10/25/2021

UNLIMITED TAXES & MORE, INC. SIGNATURE.
Authorized Signature _____       DATE   10/25/2021

**EXHIBIT "A"**

P a g e  | 4 | **Affiliate Software License Agreement**

**TAX YEAR(s)**   20 __21__   to   20 __26__

**LOCATION TYPE:**

☑ Store Front   ☐ Mobile   ☐ Kiosk/Satellite

**ACCOUNT TYPE:**

☑ Affiliate Sub-Service Bureau
☐ Senior Affiliate
☐ Tax Preparer Affiliate

**SOFTWARE PACKAGE:**   (Include Federal and All 50 states)

☑ License 1 Complimentary
☐ Additional Feeder Sites: $_____ per license.
☐ Unlimited Licenses: $_____.

**FEE(s):**   Bank & Technology Fees Excluded (those are charged by the bank and software providers)

Transmission Fee: $ __99.00__      E-File Fee: $ __99.00__
Service Bureau Fee: $ __99.00__
Direct E-file Fee: $ __275.00__ per client (non-bank products; invoiced by UNLIMITED TAXES & MORE, INC.)

**AFFILIATE'S COMMISSIONS:**

Affiliate will receive $_____ per funded federal bank product.

☑ Minimum Tax Preparation Fee to be charged $ __1,200.00__ (You WILL NOT receive commission if you do not charge the minimum tax preparation fee).

**ROYALTY FEES:**   (Percentage is calculated on tax preparation fees ONLY)

1-50 funded bank products __30.00__ % per client.       Affiliate will receive __70.00__ % per client.
51-100 funded bank products __30.00__ % per client.     Affiliate will receive __70.00__ % per client.
101-Up funded bank products __30.00__ % per client.     Affiliate will receive __70.00__ % per client.

☑ Tax Preparer Affiliate agrees to prepare at least __200__ tax returns per season. Failure to do so may result to preparation fees being forfeited, decrease in original commission and or a penalty of $ __500.00__.

**UNLIMITED TAX PROTECT**

Affiliate must use UNLIMITED TAX PROTECT on each bank product client in the event of an audit or an error is made on the tax return. If it is removed the affiliate will be billed __$ 44.99__ per client and fees will be deducted from tax preparation fees.

Notwithstanding the defined fees within this agreement, ERO and all applicable ERO's will be assessed a technology fee for any electronically transmitted document. ERO understands and agrees that any marketing relating to Demo Software will be processed through UNLIMITED TAXES & MORE, INC.'s marketing request method within the Prospecting section of UNLIMITED TAXES & MORE, INC. UNLIMITED TAXES & MORE, INC. will pay for the Demo, Shipping & Handling within reasonable volume. Should the ERO need additional Demo's or other marketing material, ERO and UNLIMITED TAXES & MORE, INC. shall address the cost on a case-by-case basis.

**EXHIBIT "B"**

The software will consist of the following modules, options and pricing.

**Bank Products and Options**

In order for an EDC/ERD Check to be considered ("Funded"), Bank must receive the tax refund from the IRS for that requested EDC/ERD Check in an amount greater than or equal to all authorized fees. ERO understands and agrees it can determine and set its own ERO fee. ERO also understands and agrees that the ERO fee must be used for the EDC/ERD Checks, not one or the other, and the fee must be the same for both. ERO may apply a different ERO fee per ERO. ERO understands and agrees that there is a UNLIMITED TAXES & MORE, INC. bank processing fee for all funded bank transactions conducted through this ERO. ERO understands and agrees that the ERO will be able to choose a bank upon time of "enrollment". ERO also understands and agrees that any other applicable fees and incentives that relate to bank products will be disclosed at that time.

**AFFILIATE / TAX PREPARER SIGNATURE**

| DATE | __10/25/2021__ |
|---|---|
| TITLE | __Tax Preparer Affiliate__ |
| PRINTED NAME | __Andrew W. Raymond__ |

SIGNATURE   *Andrew Raymond*
Andrew Raymond (Oct 25, 2021 11:13 CDT)

**UNLIMITED TAXES & MORE, INC.** Authorized Representative

| DATE | __10/25/2021__ |
|---|---|
| TITLE | __Director of Operations__ |
| PRINTED NAME | __Shonda M. Mickel__ |

SIGNATURE

## **Exhibit D**



TAXES & MORE
FRANCHISING COMPANY, L.L.C.®

## FRANCHISEE ACKNOWLEDGEMENT AGREEMENT

🔹 **FEES:**

The following fees are charged on each tax return:
(Service Bureau Fee, Transmission Fee, Technology Fee & Bank Fee); those fees exclude the tax preparation fee.

🔹 As a Tax Preparer Franchisee, you must charge a MINIMUM tax preparation fee of __$ 1,200.00__ per tax return; in order for the partnership to be beneficial to both parties.

🔹 NON-Bank Products (Direct E-FILES) will incur a fee of __$ 275.00__, the Direct E-FILE must be paid for upfront by the taxpayer. UT fee will be deducted from your commission or invoiced against your tax preparation fees.

🔹 The bank charges the Tax Preparer Franchisee for each Tax Payer advances given to clients. The fees range for __$ 45.00__ to __$ 100.00__; according to which advance the taxpayer receive. Please upcharge this product if your do not want your tax preparation fees effected.

🔹 The bank charges a fee to use debit cards and to ship additional bank checks and supplies, please BE AWARE of the charges.

🔹 You are required to prepare and bank fund at least __200__ tax returns under the **UNLIMITED TAXES AND MORE, INC.'S** Franchise Program.

🔹 Please DO NOT enter any tax preparation fees in the E-FILE sections of the software. If you do so, you will be back charged the percentage of your royalty against your E-FILE fees that you charged.

**By signing this document, I acknowledge and agree to the terms of the Franchise's Program that UNLIMITED TAXES & MORE, INC. offers. This is agreement is legally bounded.**

## UNLIMITED TAXES & MORE, INC. - FRANCHISEE

| DATE | 10/25/2021 | | |
|---|---|---|---|
| TITLE | Franchisee | | |
| PRINTED NAME | Andrew W. Raymond | SIGNATURE | *Andrew Raymond* |

Andrew Raymond (Oct 25, 2021 11:13 CDT)

## UNLIMITED TAXES & MORE FRANCHISING COMPANY, LLC.

| DATE | 10/25/2021 | | |
|---|---|---|---|
| TITLE | DIRECTOR OF OPERATIONS | | |
| PRINTED NAME | SHONDA M. MICKEL | SIGNATURE | |

**Exhibit E**



**UNLIMITED**
TAXES & MORE
FRANCHISING COMPANY, L.L.C.®

## FRANCHISEE NOTE THIS!!!

Welcome to TEAM UNLIMITED, below is some valuable information that will allow you to run your business smoothly and efficiently. This literature will familiarize you with the Franchise's program and make you aware of very important factors that will make the Tax Preparation Franchise's Program easier for you to manage.

🙌 **Shonda M. Mickel** (Director of Operations) – Email is my main point of contact (info@unlimitedtaxes.com); the lines are very busy during Peak Season, you will receive a quicker response via email.

**Department Contact Information (Concerns; Please DO NOT copy ALL Department in Emails)**

🙌 **Franchise Support** – support@unlimitedtaxes.com
Issues that support handle – Company Portal, Portal Logins, All Software and Banking Issues, Fee Payment Issues for those payment directly from the bank, Bank Log-ins or Submit a ticket via portal.
Support Direct Number: (855) 949-8324

**TEAM UNLIMITED'S**
**Hours of Operations**
**Peak Season (November – Last Day of Tax Season)**
**Off Peak Season (June – October)**

| 🙌 **Corporate** | **Inquires to Become A Part of Team Unlimited,** |
|---|---|
| Monday – Friday: 10:00 AM – 4:30 PM  EST | **Contract Issues, Franchisee Applications Process** |
| Email is BEST during Peak Season | **Franchise Inquiries** |
| Email: info@unlimitedtaxes.com | **Team Leader Inquiries** |

| 🙌 **Corporate – HR/Payroll (Service Bureau Location)** | **Payroll Issues for:** |
|---|---|
| Monday – Friday: 10:00 AM – 6:00 PM EST (Peak Season Hours) | Tax Preparer Affiliates Who receive |
| Email - payroll@unlimitedtaxes.com | <u>Weekly Payments</u> from Corporate Office. |

🙌 **Franchise Support**  |  **See Above for issues that**
(855) 949-8324  |  **support handle directly.**
Email: support@unlimitedtaxes.com

PEAK SEASON
December 1st – April 15th or the Last Day of Tax Season

OFF PEAK SEASON
April 16th (date will be announced if IRS change deadline) – November 30th

HOURS OF OPERATION

PEAK SEASON:
Monday – Saturday: 10:00 AM – 10:00PM EST
Sunday: 10:00 AM – 6:00 PM

OFF PEAK SEASON:
Monday – Saturday: 10:00 AM – 6:00PM EST
Sunday: CLOSED
EMAIL AND WE WILL RESPOND NEXT
BUSINESS DAY.

| | |
|---|---|
| ✍ **Extended Tax Preparer Software Support**<br>Monday – Friday: 11:00 AM – 5:00 PM EST<br>Email: assistance@unlimitedtaxes.com | **Assist with tax return preparation upon Emergencies. Please provide contact number in email to schedule a time for assistance.** |

**Email is the Quickest point of contact during PEAK SEASON!!!**

Initial: _AR_

**Tax Payer Advances:**
Affiliates/ERO's are responsible for ALL Tax Payer Advance Fees that the bank charge for Tax Payer advances. ALL fees are taken from Affiliates/ERO on the <u>FIRST</u> Drop/Payment!!! Please <u>UPCHARGE</u> the Tax Payer in order to recoup any fees that the bank may charge you for offering advances. Initial: _AR_

**Payroll Commission Forms:**
*Please submit ONLY One Commission Form per week, wait until the week end to see who funds. Please DON'T submit multiple forms. Initial: _AR_

**Direct E-File (Non Bank Products):**
Direct E-Files are tax returns that Affiliates/ERO get paid for upfront. Please refer to your contract for the fee that is owed Unlimited Taxes & More, Inc. for processing Direct E-File Tax Returns. Those fees cover your royalty split, software and bank filing fees. Initial: _AR_

Please pay for your Direct E-Files IMMEDIATELY upon receiving your invoice in order to prevent your Tax Preparation Software and Banking privileges from being DISABLED!!!

**Payment Methods for Direct E-Files:**
- ✍ Cash App - $Shonda Mickel (Unlimited Taxes)
- ✍ Zelle – shondamickel@hotmail.com
- ✍ PayPal – clients@unlimitedtaxes.com
- ✍ Request a Credit Card Authorization (info@unlimitedtaxes.com)

**Team Leaders (KNOW YOUR TEAM LEADER):**
Franchisee, please make note of who your TEAM LEADER is with TEAM UNLIMITED. Please reach out to your Team Leader <u>FIRST</u> with any concerns that is <u>NOT</u> a Software, Banking, Payroll or Portal Issue.
In the event they don't respond, please inform Shonda Mickel at: info@unlimitedtaxes.com.
Once you speak to, email, or reach out to one department. Please <u>DO NOT</u> continuously email various departments or call everyone in the company, it causes confusion and chaos. Please allow whom ever you reach out to handle your matter in a timely manner. Initial: _AR_

**Software Log-In/Links:**
Please <u>DO NOT</u> use any other Franchisee Tax Preparation Software Log-In or Link. In the event this happens, you will be disqualified from the Franchise Program and your tax preparation fees will be forfeited. It is a VIOLATION of company's policy. Initial: _AR_

**Tax Return Copies (Please give Tax Payer(s) a copy of Tax Return):**
You are required by LAW to give Tax Payers a copy of his/her tax return. Failure to do so will result to a company's policy violation and you may be terminated from the Franchise Program. Initial: _AR_

**Signature of Bank Documents and 8879's/8453's:**
*All Tax Payers must sign IRS Federal (E-File form 8879, State E-File 8453 and ALL Bank documents PRIOR to the transmission of ANY tax return. Failure to do so, may result to forfeiting of your tax preparation fees and/or termination from our franchise program. YOU CAN NOT FILE A TAX RETURN WITHOUT THE TAX PAYER(S) CONSENT!!! Initial: _AR_

**State Tax Returns:**
Federal Law Mandate Tax Preparers to file a State Tax Return with any Federal Return that you prepared. You must file where there is a refund, balance due or zero balance. Initial: _AR_

**Clients Direct Deposit / Debit Cards:**
Tax Preparers are prohibited from using his/her personal bank accounts to deposit tax client tax refund. This is considered FRAUD. In the event this happen, your contract will be violated immediately, your preparation fees will be forfeited and you will be prosecuted to the full extent of the Federal & State Law. Initial: _AR_

**Affiliates Email Address:**
DO NOT use your email on any Tax Payer's Account or Tax Payer's Debit Card Account. Initial: _AR_

**Commission for Partial Funding:**
On the last Friday of July, affiliates will receive commission for partial funding of their clients who are no longer awaiting a refund from either the IRS or a state (if the tax season is delayed then commission for partial funding will be delayed, as well).  Please be advised that before commission is paid, all the bank fees must be remitted, FIRST.  If your client has received a partial IRS payment and is awaiting a state refund to cover the fees or if your client has received a state refund payment and is awaiting an IRS refund to cover the fees, then your commission will be on hold until/unless the entire fee is satisfied. If there is no more funding to be received; and we cannot determine if a refund will be issued by the end of the year, then we will issue partial commission to the affiliate by the last Friday in December. Initial: _AR_

**Order Forms/Orders:**
Orders can be paid UPFRONT. Also, there is a limit on orders based on prior year history, unpaid invoice and new affiliate orders. Corporate will determine your limit and order deposit amount. The order form is available on Tax Preparer's Portal or email: order@unlimitedtaxes.com. Initial: _AR_

**Tax Preparer Fraud:**
Tax Preparer Fraud is Prohibited!!! If you are Flagged for ANY type of fraud. Your software will be disabled immediately. Your case will be fully investigated, your tax preparation fees will be forfeited and we will prosecute to the fullest extent of the Federal & State Law. FRAUD IS NOT TOLERATED AT ALL WITH UNLIMITED TAXES & MORE, INC. Initial: _AR_

**Utilizing UT Advance Links (for those who did not meet banks productivity requirement and have low funding rates):**
If you are unable to offer advances on your ASSIGNED EFIN (due to loan loss and productivity) to your clients and you opt in to use the company's link to issue advances to your clients; your percentage will be a 50/50 split. Please keep GOOD funding and PRODUCTIVITY to avoid a LOWER Percentage. Initial: _AR_

By signing this document, I have read and fully understand the protocol in which **UNLIMITED TAXES & MORE, INC.** operate their Franchise Program. I am in agreement and adhere to the rules and regulations of the Franchise Program.

_____**Andrew W. Raymond**_____          _____**10/25/2021**_____
**Franchisee Name (Printed)**                                                                                                 **Date**

_Andrew Raymond_
Andrew Raymond (Oct 25, 2021 11:13 CDT)
_____

**Signature**

# UNLIMITED
## TAXES & MORE
### FRANCHISING COMPANY. L.L.C.®

# FRANCHISE LEADER ACKNOWLEDGEMENT AGREEMENT

**National Franchise Leaders – Over 50 Accounts**
**Franchise Leader – Up to 25 Accounts**

**Franchise Leaders, please adhere to the following:**

- When signing **Affiliates**, please ensure that the proper documents are sent at the time of the application process. (**DO NOT** send incomplete documents)
  (a) Valid Driver's License and Social Security Number
  (b) PTIN Letter from IRS or Screenshot from IRS
  (c) EIN Letter (if using Business Name)
  (d) Valid Bank Account (Statement or Screenshot). Initial _AR_____

- You must ensure that **ALL** of your Affiliate's have his/her software link or installation no later than 12/20 of each year or as soon as they sign; after that date. Initial _AR_____

- You must service all of your accounts, if you **DO NOT** service accounts, you **WILL NOT** be paid for those accounts. Customer Service is a must. Please service your accounts or commissions are forfeited. Initial _AR_____

- As a Franchise Leader, you are required to fund a certain amount of bank products in order to get paid for your group. Please make sure that your yearly quotas are met!!! Initial _AR_____

- As a Franchise Leader, I urge you to make sure that your affiliates are attending all company training, webinars, seeking all company training literature and offer additional training if necessary. It is very important to make sure that you **TEAM** is ready to go for the upcoming tax season. Initial _AR_____

- You have a **GOAL** to reach as a Franchise Leader. You must sign at least 25 New Affiliates per year. In the even your **GOAL** is not met, your commissions will change according to your Franchise Leader Agreement. Initial _AR_____

- Once you reach 50 Affiliates who process and Bank Fund or 25 tax returns, you will be promoted to a National Franchise Leader. Initial _AR_____

- If you **DO NOT** sign any accounts in a particular year; you will forfeit **ALL** commissions, bonuses, etc. for that year. You will not get paid on existing affiliates until you start back recruiting and signing tax preparer affiliates. Initial _AR_____

- Please make sure that your Tax Preparer Affiliates are able to access the company's portal as soon as his/her contract is signed. Initial _AR_____

_Andrew Raymond_
Andrew Raymond (Oct 25, 2021 11:13 CDT)

| | |
|---|---|
| **Franchise Leader's Signature** | **Director of Operations Signature** |
| Andrew W. Raymond | Shonda M. Mickel |
| **Print Name** | **Print Name** |
| 10/25/2021 | 10/25/2021 |
| **Date** | **Date** |

**Exhibit G**

# TAX PREPARER FRAUD

At **UNLIMITED TAXES & MORE, INC.**, we take fraud and theft very seriously and we prosecute to the fullest extent of the federal, state and local law.

Tax Return preparer fraud generally involves the preparation and filing of false income tax returns by preparers who claim inflated personal or business expenses, false deductions, unallowable credits or excessive exemptions on returns prepared for their clients. This includes inflated requests for the special one-time refund of the long-distance telephone tax. Preparers may also manipulate income figures to obtain tax credits, such as the Earned Income Tax Credit, fraudulently.

In some situations, the client (taxpayer) may not have knowledge of the false expenses, deductions, exemptions and/or credits shown on their tax returns. However, when the IRS detects the false return, the taxpayer - not the return preparer - must pay the additional taxes and interest and may be subject to penalties.

The IRS Return Preparer Program focuses on enhancing compliance in the return-preparer community by investigating and referring criminal activity by return preparers to the Department of Justice for prosecution and/or asserting appropriate civil penalties against unscrupulous return preparers.

While most preparers provide excellent service to their clients, the IRS urges taxpayers to be very careful when choosing a tax preparer. Taxpayers should be as careful as they would be in choosing a doctor or a lawyer. It is important to know that even if someone else prepares a tax return, the taxpayer is ultimately responsible for all the information on the tax return.

## POLICY ON FRAUD RESPONSIBILITIES:

### Introduction:
Like all organizations, ours is faced with risks from wrong doing, misconduct, dishonesty and fraud. As with all business exposures, we must be prepared to manage these risks and their potential impact in a professional manner.
The impact of misconduct and dishonesty may include:

- the actual financial loss incurred
- damage to the reputation of our organization and our employees
- negative publicity
- the cost of investigation
- loss of employees
- loss of customers
- damaged relationships with our contractors and suppliers
- litigation
- damaged employee morale

Our goal is to establish and maintain a business environment of fairness, ethics and honesty for our employees, our customers, our suppliers and anyone else with whom we have a relationship. To maintain such an environment requires the active assistance of every employee and manager every day.

Our organization is committed to the deterrence, detection and correction of misconduct and dishonesty. The discovery, reporting and documentation of such acts provides a sound foundation for the protection of innocent parties, the taking of disciplinary action against offenders up to and including dismissal where appropriate, the referral to law enforcement agencies when warranted by the facts, and the recovery of assets.

### Purpose:
The purpose of this document is to communicate company policy regarding the deterrence and investigation of suspected misconduct and dishonesty by employees and others, and to provide specific instructions regarding appropriate action in case of suspected violations.

### Definition of Misconduct and Dishonesty:

For purposes of this policy, misconduct and dishonesty include but are not limited to:

- Acts which violate the organization's Code of Conduct
- Theft or other misappropriation of assets, including assets of the company, our customers, suppliers or others with whom we have a business relationship
- Misstatements and other irregularities in company records, including the intentional misstatement of the results of operations
- Profiteering as a result of insider knowledge of company activities
- Disclosing confidential and proprietary information to outside parties
- Forgery or other alteration of documents
- Accepting or seeking anything of value (limits defined in [Code of Conduct, gift and entertainment policy, other]) from contractors, vendors, or other persons providing services/materials to the company.
- Fraud and other unlawful acts
- Any similar acts.

The company specifically prohibits these and any other illegal activities in the actions of its employees, managers, executives and others responsible for carrying out the organization's activities.

### Policy and Responsibilities:

### Reporting:

It is the responsibility of every employee, supervisor, manager and executive to immediately report suspected misconduct or dishonesty to [their supervisor, internal audit, legal, other].  Supervisors, when made aware of such potential acts by subordinates, must immediately report such acts to [their supervisor, internal audit, legal, other]. Any reprisal against any employee or other reporting individual because that individual, in good faith, reported a violation is strictly forbidden.

Due to the important yet sensitive nature of the suspected violations, effective professional follow up is critical. Managers, while appropriately concerned about "getting to the bottom" of such issues, should not in any circumstances perform any investigative or other follow up steps on their own. **Concerned but uninformed managers represent one of the greatest threats to proper incident handling.** All relevant matters, including suspected but unproved matters, should be referred immediately to those with follow up responsibility.

To facilitate reporting of suspected violations, especially in those situations where the reporting individual wishes to remain anonymous, the company has established a telephone hotline.

### Additional Responsibilities of Supervisors:

All employees have a responsibility to report suspected violations.
However, employees with supervisory and review responsibilities at any level have additional deterrence and detection duties. Specifically, personnel with supervisory or review authority have three additional responsibilities.

- First, you must become aware of what can go wrong in your area of authority.
- Second, you must put into place and maintain effective monitoring, review and control procedures that will prevent acts of wrongdoing.
- Third, you must put into place and maintain effective monitoring, review and control procedures that will detect acts of wrongdoing promptly should prevention efforts fail.

Authority to carry out these three additional responsibilities is often delegated to subordinates.  However, accountability for their effectiveness cannot be delegated and will remain with supervisors and managers.

Assistance in effectively carrying out these responsibilities is available upon request through (the corporate controller, internal audit, the corporate legal department, and through other sources).

Fraud is prohibited at **UNLIMITED TAXES & MORE, INC.** Any Suspicion of Fraud will be immediately investigated. Your software and banking will be Deactivated until Fraud claim is fully resolved. ALL commissions will be forfeited in the event of ANY Fraud and the case will be turned over to the Federal, State and Local Law Enforcement.

**Questions or Clarifications Related to This Policy:**

All questions or other clarifications of this policy and its related responsibilities should be addressed to **C. Vanessa Mallard; Human Resources Manager**, who shall be responsible for the administration, revision, interpretation, and application of this policy.

===============================

*Acknowledgment:*

My signature signifies that I have read this policy and that I understand my responsibilities related to the prevention, detection and reporting of suspected misconduct and dishonesty.

I further acknowledge that I am not aware of any activity that would require disclosure under this or other existing company policy or procedure statements.



| SIGNATURE: | *Andrew Raymond*<br>Andrew Raymond (Oct 25, 2021 11:13 CDT) |
|---|---|
| PRINT NAME: | **Andrew W. Raymond** |
| DATE SIGNED: | **10/25/2021** |

## **Exhibit H**



# TAX PREPARER AFFILIATE ACKNOWLEDGEMENT AGREEMENT

## FEES:

- **The following fees are charged on each tax return:**
  (Service Bureau Fee, Transmission Fee, Technology Fee & Bank Fee); those fees exclude the tax preparation fee. Initial _____

- **As a Tax Preparer affiliate, you must charge a MINIMUM tax preparation fee of** __$1,200.00__ **per tax return; in order for the partnership to be beneficial to both parties. You will not receive commission, if you don't charge MINIMUM Fee!!! Initial** _____

- **NON-Bank Products (Direct E-FILES) will incur a fee of** __$275.00__ **, the Direct E-FILE must be paid for upfront by the taxpayer. UT fee will be deducted from your commission or invoiced against your tax preparation fees. Initial** _____

- **The bank charges the Tax Preparer Affiliate for each Tax Payer advances given to clients. The fees range for** __$45.00__ **to** __$100.00__ **; according to which advance the taxpayer receive. Please upcharge this product if your do not want your tax preparation fees effected. All Advance Fees are deducted from your FIRST DROP!!! Initial** _____

- **The bank charges a fee to use debit cards and to ship additional bank checks and supplies, please BE AWARE of the charges. Initial** _____

- **You are required to prepare and bank fund at least** __200__ **tax returns under the UNLIMITED TAXES AND MORE, INC.'S affiliates program. Initial** _____

- **Please DO NOT enter any tax preparation fees in the E-FILE sections of the software. If you do so, you will be back charged the percentage of your royalty against your E-FILE fees that you charged. It is prohibited and against company policy. Initial** _____

- **Tax Payers are to receive a Copy of His/Her tax return prior to transmission. Failure to do so may prevent you from receiving your commissions and/or jeopardize your status with the company. Initial** _____

- **All Tax Payers must sign bank documents, 8879's/84534's (IRS/State Electronic Signature Forms) PRIOR to transmission of a tax return. Failure to do so, may prevent payment of your commission and/or jeopardize your status with the company. Initial** _____

- **Once you elect your Tax Preparation Software and is set up by the company, if you switch, there will be a $75.00 fee to switch Tax Preparation Software. Initial** _____

- **DO NOT change ANY BANKING PASSWORDS ONCE provided by UNLIMITED TAXES & MORE, INC. Initial** _____

**By signing this document, I acknowledge and agree to the terms of the Tax Preparer Affiliate's Program that UNLIMITED TAXES & MORE, INC. offers. This is agreement is legally bounded.**

## AFFILIATE / TAX PREPARER

| DATE | 10/25/2021 | | |
|------|------------|--|--|
| TITLE | Tax Preparer Affiliate | | |
| PRINTED NAME | Andrew W. Raymond | SIGNATURE | *Andrew Raymond*<br>Andrew Raymond (Oct 25, 2021 11:13 CDT) |

## UNLIMITED TAXES & MORE, INC. Authorized Representative

| DATE | 10/25/2021 | | |
|------|------------|--|--|
| TITLE | Director of Operations | | |
| PRINTED NAME | Shonda M. Mickel | SIGNATURE | |

# **Exhibit I**

**<u>Exhibit F</u>**

 **SHONDA MICKEL**                    3/16/22

To: Andrew & 2 more... >

# Re: Non payment

Andrew,

You're very immature!!! Your fees are forfeited.

Please don't contact me again - your attorney can correspond with my attorney.